# State of Vermont v. Gregory Stephen FitzGerald

[683 A.2d 10]

No. 94-650

Present: **Allen, C.J.,\* Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed July 5, 1996

Motion for Reargument Denied July 26, 1996

*Scott Kline*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Robert M. Paolini* of *Martin & Paolini*, Barre, and *Gregory FitzGerald*, pro se, Swanton, for Defendant-Appellant.

**Morse, J.** Defendant appeals from his conviction by jury of first-degree murder. He claims that the court erred in denying his motion for mistrial, which was based on the admission of a statement allegedly obtained in violation of his rights under *Miranda v.*

---

\* Chief Justice Allen sat for oral argument but did not participate in the decision.

*Arizona,* 384 U.S. 436 (1966). Defendant also contends that the court erred in failing to voir dire the jury about alleged misconduct by one of the alternate jurors. Acting pro se, defendant claims, as well, that the court erred in denying his motion for judgment of acquittal, arguing that the State failed to establish that the victim was dead on the date the murder allegedly occurred. We affirm.

On May 20, 1993, defendant was charged with murdering his wife, Amy FitzGerald, in Shelburne, Vermont on May 8 of that year. After his arrest in Massachusetts, defendant waived extradition, and was transported to Vermont.

Prior to the murder, defendant had lived in Texas while his wife attended graduate school at the University of Vermont. Defendant had told his wife that he was attending the University of Texas but, in fact, he had been placed on academic dismissal in 1992. Unbeknownst to his wife, defendant had been involved with a woman in Texas since 1991. He had also removed his wife's jeep from a parking lot without her knowledge and placed it in storage. He reported the jeep stolen and recovered the insurance proceeds in January of 1993. The jeep was discovered at the storage facility and impounded by the police on May 1, 1993. Shortly thereafter defendant decided to kill his wife.

At trial the State introduced evidence of defendant's scheme involving multiple rental cars and an elaborate schedule of air travel, designed to conceal his involvement in the crime. The evidence showed that defendant had driven with a friend from Texas to Connecticut, flown from Connecticut to Texas and back to Connecticut, driven to Vermont, and then murdered his wife in her Shelburne condominium on May 8. Neighbors of the victim reported hearing crashing noises and the sound of a woman screaming at approximately 4:00 am that day.

Amy's body was discovered on May 11. An autopsy revealed that she had died of asphyxiation two to four days before her body was found. Ultimately, several witnesses, including friends and relatives of defendant, testified that he had confessed to them. After a ten-day trial defendant was convicted of first-degree murder.

I.

Defendant first contends that the trial court erred in denying his motion for a mistrial. This issue revolves around testimony of Vermont State Police Detective Sergeant Timothy Bombardier, the officer who transported defendant from Massachusetts to Vermont. Sergeant Bombardier testified that at a highway rest area he and

defendant had the following exchange about defendant's friend Ricky, who had driven with defendant from Texas to Connecticut before the murder was committed:

> Q. Could you tell us what Mr. FitzGerald said to you while at this rest stop?
> A. He asked me where Rick was, or where Ricky was.
> Q. And what did you respond to Mr. FitzGerald?
> A. Words to the effect of, he's in Texas, why?
> Q. And what did he say in response to that?
> A. That's good, he had nothing to do with it.

Prior to being transported, defendant had invoked his privilege against self-incrimination and had indicated that he wished to speak to an attorney. He claims that Sergeant Bombardier's response, "He's in Texas, why?" constituted custodial interrogation in violation of his *Miranda* rights.

The State's original offer of proof regarding this testimony did not include "why?". Because the defense did not know of the interrogatory nature of the response until it was given at trial in front of the jury, this issue was not decided prior to trial. After a conference in chambers, the court concluded that the officer's query did not constitute interrogation for purposes of *Miranda* and denied defendant's motion for a mistrial.

The safeguards of *Miranda* attach whenever a person in custody is subjected to interrogation. See *Miranda*, 384 U.S. at 444. Under *Miranda*, the term "interrogation" encompasses only "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Although the focus of the inquiry is on the perception of the suspect, the police cannot be held accountable for the unforeseeable results of their words and actions. *Id.* at 302. Thus, an incriminating statement made in the course of casual conversation is not the product of interrogation. *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir. 1984).

Here, defendant initiated a casual conversation with Sergeant Bombardier at a highway rest stop. Officer Bombardier responded to defendant's question about Ricky's whereabouts with a common figure of speech. As the trial court found, the "why?" did not, under the totality of the circumstances, constitute an invitation for defendant to incriminate himself. There is no evidence that Sergeant Bombardier knew or should have known that his words were likely to

elicit an incriminating response. The court correctly concluded that the exchange between defendant and Sergeant Bombardier did not constitute interrogation.

The case defendant relies upon, *People v. Olivera*, 647 N.E.2d 926 (Ill. 1995), is inapposite. In *Olivera*, a suspect was included in a police lineup, after which everyone, except the suspect and a police detective, was removed from the room. The suspect, who earlier had invoked his *Miranda* rights, asked what had happened. The detective responded that the suspect had been positively identified. Although the detective reminded the defendant of his rights, the defendant went on to make an incriminating statement.

Thus, in *Olivera*, the suspect was confronted with substantive evidence of guilt. The Illinois Supreme Court held that the detective should not have responded to the question except to remind the suspect of his rights, because revealing that the suspect had been positively identified was likely to elicit further statements. *Id.* at 930.

Here, in contrast, defendant was not confronted with substantive evidence of guilt. Defendant initiated a casual conversation with Sergeant Bombardier, who tagged a "why" onto his answer to defendant's apparently innocuous question. Nothing in the circumstances or content of the exchange could be deemed likely to elicit an incriminating statement. There was no violation of defendant's *Miranda* rights, and the motion for a mistrial was properly denied. See *State v. Jones*, 160 Vt. 440, 449-50, 631 A.2d 840, 847 (1993) (court's ruling on motion for mistrial will be upheld unless discretion was totally withheld or exercised on untenable grounds). Furthermore, even if defendant's statement had been obtained in violation of *Miranda*, its admission would not mandate reversal. Other witnesses, including defendant's friend Denise O'Brien and his cousin Robert Saville, testified that defendant had confessed to murdering Amy, and had made statements to the effect that the man he had travelled with was innocent. Thus, defendant's statement, "That's good, he had nothing to do with it," if construed to mean that defendant had personal knowledge of the crime and that his companion was innocent, is cumulative. We conclude that admission of the statement, even if constitutionally invalid, was harmless beyond a reasonable doubt. See *State v. Streich*, 163 Vt. 331, 346, 658 A.2d 38, 49 (1995) (error of constitutional magnitude is harmless where it is clear beyond reasonable doubt that jury would have returned guilty verdict regardless of error).

## II.

Next defendant claims that the trial court erred in failing to examine the jurors individually after allegations of misconduct by an alternate came to light. On April 19, 1994, after the court announced that the jury had reached a verdict, the defense revealed that it had received notice from the public defender's office of potential juror misconduct. Robert Backus, a public defender, told the court that one of his clients claimed that an alternate juror had discussed the case with neighbors. Backus, who was not able to verify the allegations, stated that his client wished to remain anonymous.

The court proposed that it question the alternate to ascertain whether there was any substance to the allegations. The court stated that the parties would have the opportunity to ask questions during the examination. Defendant was present when the court made this suggestion. The court went on to say that if the allegations of misconduct were substantiated during the examination, it would question the jury about whether any conversations took place between the alternate and the panel during the trial.

The alternate was questioned under oath by the court. She stated that she had mentioned to both her husband and her mother that she "wish[ed] [the trial] would get over with." She denied discussing the substance of the trial with anyone, but conceded that she had told another juror that she was "glad [she] didn't have to vote either way."

The State did not question her, and defense counsel asked only if she had told anyone that she believed defendant was guilty. She stated that she had not. The alternate was excused. The parties then agreed that the panel could be questioned about the situation in a post-verdict proceeding.

Subsequently, defendant declined the court's invitation to question the jury. Instead, the defense stated its preference that the court say nothing about the misconduct issue at that time. Defense counsel also remarked that the alternate's comment to the other panel member "is not something that I can say would probably have affected the outcome."

After the verdict was announced and the jury polled, the court asked counsel if anything further needed to be done before the panel was excused. The defense replied that, other than instructing the jury not to discuss the case, nothing needed to be done. The court instructed the jury as the defense requested, and the panel was excused.

On May 16, 1994, defendant filed a motion for a new trial based on juror misconduct. In the motion defendant requested a hearing to

enable him to examine Robert Backus and Jerry Schwartz, also of the public defender's office, about the statements made by Backus's client regarding the alternate juror. Defendant did not request that the jurors be questioned. At the hearing, defendant offered no new evidence, but simply contended that a new trial should be granted based on juror misconduct, and that Backus should be ordered to reveal the identity of his client and the substance of the statements made about the alternate.

After reviewing the transcript of the April 19 proceedings, the trial court stated that there was no evidence that the alternate had discussed the outcome of the case with other panel members. The court also noted that, when questioned, the jurors indicated that no extraneous information about the case had come to their attention. The alternate had been questioned under oath, and the court remarked that it found her testimony credible. Emphasizing that the defense could have investigated the matter on its own, the court denied defendant's request for an order compelling Backus to reveal the identity of his client.

On August 2 the court orally denied the motion for a new trial. The court found that there was no opportunity for taint during deliberations because the alternate was not present during that phase of trial. The court noted, again, that the jurors had indicated that no extraneous information had come to their attention, and concluded that the deliberations were intact, and untainted.

Defendant's argument, that the court erred by failing to examine the jurors individually, is made for the first time on appeal. As the record indicates, defendant never asked the court to examine the jurors, either prior to dismissing them, or in his motion for a new trial. Arguably this issue is not preserved. Where defendant does not preserve an issue for appeal, we will not review it sua sponte unless we find plain error. *State v. Duford*, 163 Vt. 630, 630, 660 A.2d 736, 737 (1995).

Relying on *State v. Prime*, 137 Vt. 340, 403 A.2d 270 (1979), defendant couches his claim in constitutional terms, arguing that "[t]he right to an unbiased jury is a personal right which may be waived only by the defendant and only with a knowing and intelligent waiver." *Id.* at 343, 403 A.2d at 272. Based on this holding, defendant contends that his attorney's decision not to question the jury does not bind him. He argues that the circumstances of this case were capable of prejudicing the jury deliberations, and that, because the court did not obtain his personal waiver, reversal is mandated. *State v. Woodard*, 134 Vt. 154, 158, 353 A.2d 321, 323-24 (1976).

We first note that *Prime* is readily distinguishable from the instant case. In *Prime*, a petition to place the state's attorney's name on a ballot had circulated among the jury. After receiving notice of the problem, the court offered defense counsel the opportunity to voir dire the jurors or to discharge them and begin anew. Defendant was not present during the incident and was never informed about the petition. Nevertheless, defense counsel waived any claim of bias. Here, in contrast, defendant was present during the entire discussion, and had ample opportunity to discuss the matter with counsel and to request voir dire if he so desired.

*Woodard* is also inapposite. In *Woodard* a juror overheard a telephone call during which the defendant stated that he needed an alibi. The juror did not disclose what he had heard to the court for several hours, during which time he continued to hear testimony and remained seated with the other jurors. The court did not ask the juror whether he had shared what he had heard, but simply excused him. Thus, in *Woodard* a juror who was exposed to an influential piece of extraneous information subsequently mingled with other jurors prior to deliberations, and the court did nothing to ascertain whether the information had been shared. Under those circumstances concerns about jury taint would arise. In the instant case, however, there is no evidence to warrant an inference that any juror was exposed to extraneous information.

Moreover, *Prime* and *Woodard* were subsequently clarified by *State v. Onorato*, 142 Vt. 99, 453 A.2d 393 (1982), in which this Court explained that application of the *Prime/Woodard* rule is limited to situations

> where the trial court, upon discovering the possibility of jury prejudice, fails to voir dire the jury to determine if in fact any prejudice had been created. Absent this examination, the trial judge lacks a basis for determining if any prejudice exists, and consequently this Court has no record from which it can determine if the jury was fair and unbiased.

*Id.* at 106, 453 A.2d at 396.

Here, the trial court examined the juror suspected of misconduct under oath. She denied any wrongdoing, and the court noted that it found her testimony credible. The court also asked the jurors if any extraneous information had come to their attention, and they indicated that it had not. In light of this information, and the fact that the juror in question was an alternate who did not participate in

deliberations, the court concluded that the deliberations were untainted. Thus, the court did establish a basis for reviewing whether prejudice had been created, and concluded that it had not. We agree. The holdings of *Prime* and *Woodard* are inapplicable here, and the issue of personal waiver does not arise.

Defendant has made no showing of actual jury bias, and his claim that the court had a duty to conduct individual voir dire is without merit. See *id.* at 105, 107, 453 A.2d at 396, 397. We find no error in the record before us.

### III.

Next, acting pro se, defendant claims that the court erred in denying his motion for judgment of acquittal, arguing that the State "failed to prove beyond a reasonable doubt, the corpus delicti." Boiled down, defendant's argument is that the State failed to prove that the victim was dead on the day the murder allegedly occurred. He contends that evidence introduced by the State regarding a pregnant friend of Amy's rebutted the inference that the screaming and crashing noises that neighbors heard on May 8 were the sounds of Amy being murdered. Instead, he claims, the screaming woman could have been Amy's friend going into labor.

At common law, corpus delicti means the body of the crime. *State v. Goyet*, 120 Vt. 12, 22, 132 A.2d 623, 631 (1957). In the case of homicide it is composed of two elements: (1) the death of a person (2) produced through criminal agency. *Id.*

The purpose of the corpus delicti rule is to foreclose the possibility of conviction based on false confession where, in fact, no crime has been committed. *State v. Weller*, 162 Vt. 79, 83, 644 A.2d 839, 843 (1994). The rule mandates that where the State's case is based on a confession, the corpus delicti must be corroborated by independent evidence. *Id.* at 82, 644 A.2d at 841. The corroborating evidence need not independently prove commission of the crime beyond a reasonable doubt, however; even slight corroboration may be sufficient. *Id.* Determination of whether corroboration is adequate is the province of the court. *Id.* at 83, 644 A.2d at 842.

In this case, the discovery of Amy's asphyxiated body alone established both elements of the corpus delicti. Contrary to defendant's argument, the corpus delicti rule does not require the State to produce evidence of the time of death. Instead, here, as in all criminal cases, defendant was protected by instructions that directed the jury

to determine whether the State had proved the elements of the crime beyond a reasonable doubt. It was for the jurors to decide whether the State had met its burden in establishing the date and circumstances of Amy's death, and they concluded that it had. The evidence against defendant was strongly probative and abundant. The motion for judgment of acquittal was properly denied. See *State v. Tonzola*, 159 Vt. 491, 496, 621 A.2d 243, 245 (1993) (in reviewing denial of motion for judgment of acquittal we view evidence in light most favorable to State and uphold ruling if evidence fairly and reasonably could convince trier of fact of defendant's guilt).

*Affirmed.*