NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 19

No. 2017-307

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Robin O'Neill | December Term, 2018 |

Katherine A. Hayes, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Rebecca Turner, Appellate Defender, Montpelier, for
  Defendant-Appellant.

PRESENT: Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Howard, Supr. J. (Ret.),
         Specially Assigned

¶ 1.    **ROBINSON, J.**    Defendant Robin O'Neill appeals from a jury conviction for aggravated murder of her ex-fiancé and his son. She argues that the evidence was insufficient to support the conviction; that her statements to police should have been suppressed because they were the product of custodial interrogation without an attorney after she invoked her right to one; and that those statements should have been suppressed because the police coerced her into making them, depriving her of due process. We hold that the evidence sufficiently and fairly supports the conviction; and that the statements defendant seeks to suppress were not made in response to police interrogation, and were not the product of police coercion, and thus were properly admitted. Accordingly, we affirm.

¶ 2.    The evidence at trial, viewed in the light most favorable to the State, reflected the following.  Defendant and Steven Lott began a relationship in early 2014.  She subsequently moved into his house, and they got engaged that July.

¶ 3.    In September 2014, Steven's neighbor and friend, who lived part-time in California, returned to Vermont.  Steven began spending a lot of time at her house, which upset defendant.  Throughout that fall, defendant and Steven argued about their relationship and about Steven's relationship with neighbor.  Defendant considered moving out of the house.

¶ 4.    That October, defendant threatened and physically hurt Steven, and when Steven would visit neighbor, defendant would at times follow him.  Defendant wrote in her diary on October 27, "I got pretty drunk.  S down to [neighbor's].  I knocked on dr; not let in.  Listened window – basement.  S said I threatened to kill him."  Defendant's diary reflected that on October 25 she discussed with Steven that she "had hit him on [the] head with firewood." Neighbor testified that around late October, Steven came to her house and seemed unfocused and distressed; she thought at the time he might have a head injury.  After neighbor touched Steven's head to see if he was injured, she heard tapping on the storm door, and when they called out to ask who it was, they heard a female voice speak but could not make out the words.  Neighbor testified that Steven opened the door, then quickly slammed it.  Neighbor heard a car drive away. Around that time, defendant told one of Steven's friends that she had gone down to neighbor's house and stood under a window, listening to Steven and neighbor talking.  Defendant said she heard neighbor tell Steven that he needed "to get rid of her."

¶ 5.    In early November, defendant told her friend Mike that her engagement with Steven was off.

¶ 6.    In the late afternoon of Saturday, November 15, Steven went to neighbor's house to fix her vacuum and remained there for several hours.  While he was there, their friend Rob

2

dropped by neighbor's house and visited. Rob testified that while he was there, he saw defendant drive past the house six times.

¶ 7. Sometime that same Saturday, Steven hit defendant, causing bruises to her shoulder, legs, arm, head, and buttocks. Late that night, Steven went to neighbor's house. Neighbor and her daughter testified that he appeared disheveled and scared. He said he had been in bed arguing with defendant when she rolled over and reached for a drawer in her bedside table. He leapt up, grabbed clothes, and fled. Neighbor's daughter asked what was in the bedside table, and Steven replied, "I don't know, and I didn't want to find out."

¶ 8. On Sunday, November 16, witnesses who were driving by neighbor's house saw defendant walking around behind the house, then saw Steven drive quickly up to it. Around that time, Steven told defendant he wanted her out of the house.

¶ 9. On Tuesday, November 18, defendant told a number of people that Steven had hit her. In response, her coworker urged her to report it. Defendant responded that she wasn't "going to do that, because it was never going to happen again." Defendant then angrily told her coworker about Steven's sexual failings and the resulting impact on their relationship. Later, when defendant told an acquaintance about the assault, she also told the acquaintance that Steven had said he should have married neighbor. Defendant also told the acquaintance that she planned to move out of the house.

¶ 10. In the afternoon of Tuesday, November 18, defendant began to drink. When Steven's friend Morgan came over in the late afternoon, he found Steven, his son Jamis, and defendant sitting and talking in the kitchen area. Morgan testified that defendant told him she was not with Steven anymore, tried to kiss him, and asked if he wanted to have sex. He declined, and defendant went upstairs. Morgan said it sounded like she started breaking things. He did not see any guns in the kitchen area, although this was not surprising as he knew that Steven kept his guns upstairs.

3

¶ 11.   At around 7:00 or 7:30 that evening, neighbor received three calls.  Each time, the caller said nothing and hung up.  Caller ID showed that one of the calls was from Steven's house; the other two numbers were blocked.

¶ 12.   At 7:54, defendant called an acquaintance, Kristina, but did not say anything, then hung up.  Kristina called back and someone picked up the phone but did not speak.

¶ 13.   At 8:01, defendant called her sister and told her that Steven had hit her, and that she might be going to stay at a friend's house.  She sounded stressed, rushed, and a little embarrassed, but not intoxicated.  While they were speaking, defendant got another call, so her sister hung up and waited.

¶ 14.   The other caller was Kristina.  Kristina asked if Steven was there.  Defendant laughed and said no.  They had a confused conversation, then defendant said she was on the phone with her sister and hung up.  At 8:26, defendant called Kristina again; they had another brief and confused conversation in which defendant apologized for not being able to speak earlier because her sister was on the line.  They hung up, and then at 8:38 defendant called back again and they had the exact same conversation.

¶ 15.   At 8:48, defendant called her friend Mike.  She asked him to take her dog, and when he asked what the problem was, she said, "I just shot Steve and Jamis."  She went on, "I did it, I really did it.  I just shot Steve and Jamis dead."  Mike asked where they were, and she said, "Steve's by my feet in a pool of blood and Jamis is under the table in his own pool of blood."  Mike testified that defendant sounded as though she had been drinking.  When they hung up, he called the police.

¶ 16.   Defendant's sister called her back at 8:58.  Defendant picked up and said, "I shot them, I think they're dead, there's blood, there's so much blood.  And I don't know how I managed."  Her sister asked her why she did it, and defendant said in a sad, confused voice, "I don't know."  At that point, she heard police and the call ended.

4

¶ 17.    When police arrived on the scene, they called defendant out of the house.  She came out, walking unsteadily on her feet.

¶ 18.    A trooper testified that defendant smelled of alcohol, her eyes were bloodshot and glassy, her speech was slurred, and she was at times hyperventilating and "in hysterics."  A preliminary breath test taken at 9:56 showed that defendant's blood-alcohol content was 0.233.

¶ 19.    Once placed in the police cruiser, where a video camera recorded the activity in the back seat, defendant told an officer, "maybe you should shoot me" and he replied, "we're not going to do that."  She then said, "I've actually done this just the other night which is what I have pictures of, of Steve beating the holy crap out of me."  The officer responded that he was going to pin her handcuffs so they would not tighten up on her.  She continued, "Yeah, yeah ya understand the reason I shot the motherfucker oops wait a minute, nope, I didn't say anything, I didn't say anything, I hear a female voice."  She then asked, "Would you have somebody here? . . . A, a like um what do you call them? . . . A person who defends people who have had the crap beat out of them and then."

¶ 20.    Defendant then said, "I could have used another drink before this," and asked if the officer could get the red wine and cigarettes from the house.  He said, "I don't know, I can ask.  Would you like me to ask for you?" and then inquired several times more if she wanted him to ask for her.  She said yes, that would be nice because she was being arrested for murder.  The officer then left defendant in the cruiser.  She continued to talk to herself, saying "you killed the motherfucker . . . but he's dead, dead as a board, he put you through amazing amounts of hell, hell, hell, hell, and hell again, he made you so, he tried terribly to make you nuts."  She reflected some awareness that a camera in the cruiser was recording her statements: At one point, she said "of course they're recording anything I say in this car, I shouldn't talk to myself at all."  When the officer returned, he told defendant he had asked about "that glass of wine" and "they said not

5

right now." Defendant did not appear to respond to him, but instead muttered "not exactly a killer," then began to hyperventilate, sob, and express disbelief at what was happening.

¶ 21. Soon thereafter, an officer got in the car and drove her to the police station. During the drive, defendant spoke to herself at length about the events of that night. She expressed disbelief, saying things like, "The one I loved the most? I killed Jamis? I killed you? Yeah ah no, no, no, no, no, couldn't possibly happen." She said, "Jamis was my absolute favorite of you three boys and I shot him, you think, or that's what you're saying I did?" She also periodically addressed her dog and her friend Mike, turning to talk to them as though they were there. She asked the officers to shoot her several times, and at one point, she seemed to suggest that the officers were taking her into the woods to kill her, saying, "if we're riding off into the middle of the woods in the middle of everywhere and you're going to shoot me that would be very nice thank you. I hope so, just make sure you get me in the head first, please."

¶ 22. Throughout the drive, the officer said nothing to defendant except when she asked where they were going and he replied they were going to his office in West Brattleboro.

¶ 23. Once they reached the police station, an officer put defendant, handcuffed, in a processing room. He told her that if she needed anything, he would be nearby. Defendant asked, "well how about another bottle of red wine and a pack of cigarettes?" The officer responded, "I'll make the request for you," and left.

¶ 24. In the processing room, defendant continued to talk to herself, and these statements were also recorded. She spoke to herself and to Steven. She pointed to the ground and asked, "Steven . . . was that you there? . . . You motherfucker . . . . You're presumably dead, although I think, of all awful things, I think I got Jamis better." At one point, an officer came in and asked if defendant had been calling him, and she clarified that she was talking to Steven, "whom I'm—I'm sure accused of having killed." She occasionally spoke to officers—as when an officer came in to help her get a tissue and she asked if they were going to let her pee in her

6

pants like "a TV thing," and the officer told her, "I can assure you this is not TV." When the officer told her he would be around if she needed anything, defendant replied "can you just kind of dial back a couple of hours?" to which the officer said, "I wish I could." She then said, "if you could get me the loaded nine-millimeter . . . then we can end it all." The officer said he would be in the other room if she needed him and left.

¶ 25. Later, when a detective came in to check on her, she said, "my so-called diary and my computer could shed a whole lot of light on this." He said "okay" and told her he wanted to "come in and chat with [her] in a little bit." He told her he had been asked to talk with her about what had happened, and she replied she didn't know and didn't remember anything except being "on the phone with a friend, standing over bodies with lots and lots of blood going." She then kept repeating that she didn't know how it happened. She asked again for a public defender, saying, "I've just given you motive," and the detective said he would be back to talk with her in a couple minutes and left.

¶ 26. As officers periodically came in to check on her, she repeatedly asked for a public defender, to which the officers responded by telling her they would be with her in a little bit.

¶ 27. The evidence showed that Jamis was shot three times in the head and Steven was shot twelve times—seven times in the head and upper neck; once in the chest; and four times in the groin. Jamis was shot from multiple angles less than a few feet but more than a few inches away. Steven was likely shot from more than three or four feet away. Police found a total of fifteen nine-millimeter cartridge cases on the scene, ten of which a laboratory test showed as having been fired from the nine-millimeter gun found on the scene—the test was inconclusive as to the rest. The bullet fragments found on the scene could not be conclusively matched to a gun. DNA tests were done on the three guns found on the scene; a swab from the nine-millimeter handgun showed DNA consistent with defendant's and Steven's and a possible third person's; a swab from the second gun showed DNA that was almost certainly Steven's but none that

7

matched defendant's; and a swab from the third gun showed nothing. Fingerprint examinations of the guns revealed nothing, although this was not unusual. Steven's son Brenton testified that Steven kept the nine-millimeter gun in his bedroom. A box of nine-millimeter bullets was found in a nightstand in an upstairs bedroom; it was made to hold twenty bullets, but fifteen were missing.

¶ 28. Defendant owned a gun and people had seen her shoot it in a field.

¶ 29. While the crime scene was very bloody, there was no blood on defendant. No blood was found on defendant's clothing or the guns in the house. In the home, police found blood spatter on the floors, walls, and the light hanging above the dining-room table. An officer testified that, given the blood at the crime scene, he expected the shooter to have bloody clothes and shoes. Likewise, defendant's expert witness testified that he would have expected both forward and backward spatter from Steven's and Jamis's wounds, some of which would likely have gotten on the shooter—although an expert witness for the State testified that, generally, there is more spatter in the direction the bullet traveled, and about twenty-six percent of the time a shot yields no back spatter.

¶ 30. An expert witness testifying for defendant said that the kinds of shell casings found at the scene could indicate that more than one gun had been used. He also noted that there were two ladders leaned up against the house, which could have allowed someone to get into the upper floor of the house and come down the stairs to shoot Steven and Jamis.

¶ 31. The jury convicted defendant. After trial, defendant moved for a judgment of acquittal and for a new trial. The court denied these motions.

¶ 32. On appeal, defendant argues that the evidence was insufficient to support the conviction; that her statements to police in the cruiser and the processing room should have been suppressed because they were the product of custodial interrogation after she had invoked her right to an attorney; and that those statements should have been suppressed because the police

8

coerced her into making them, depriving her of due process. We will address each argument in turn.

## I. Sufficiency of Evidence

¶ 33. Defendant argues that the evidence was insufficient to support her conviction. She contends that none of the State's evidence conclusively establishes her guilt, and thus the jurors relied on impermissible speculation in convicting her. She argues that her extreme intoxication at the time was inconsistent with the shooter's accurate aim, evidenced by the fact that all fifteen of the shots fired hit Steven and Jamis. She also argues that the fact that she had no blood on her or the clothes she was wearing that day was inconsistent with the bloody crime scene. She contends that there were important gaps in the State's evidence—including that the State should have attempted to determine the identity of the third person whose DNA was found on the nine-millimeter gun—and in particular it should have determined if it matched the DNA of Morgan or another identified individual, both of whom were at or near the house that evening. She argues that in the absence of conclusive forensic evidence, the State's case hinges entirely on her opportunity and motive. She argues that the State has offered no evidence that she had any motive to kill Jamis, and its argument that she killed Steven out of jealousy and frustration with their relationship relies on reductive stereotypes about women. The crux of the State's case, she argues, is the happenstance that she was home at the time of the murders—but even this is insufficient to show she was the killer, when the house was unlocked and people frequently came and went from it.

¶ 34. Applying an appropriately deferential standard of review, we conclude that the State presented sufficient evidence from which a jury could find each of the required elements of aggravated murder.

¶ 35. In considering a sufficiency-of-the-evidence challenge, this Court reviews the evidence in the light most favorable to the State, excluding any modifying evidence, to

"determine whether that evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." State v. Brochu, 2008 VT 21, ¶ 21, 183 Vt. 269, 949 A.2d 1035 (quotation omitted). Where a defendant argues that the State's evidence is insufficient because it is susceptible to multiple interpretations, not all of which point toward guilt, this Court must determine whether the State's theory of the evidence could fairly support the conviction. State v. Godfrey, 2010 VT 29, ¶ 13, 187 Vt. 495, 996 A.2d 237; see also State v. Warner, 151 Vt. 469, 472, 560 A.2d 385, 387 (1989) ("[T]he State is not required to exclude every reasonable hypothesis of innocence in proving a case with circumstantial evidence."). The fact that the evidence was "circumstantial . . . does not mean that the evidence was insufficient. As we have noted, many crimes occur without eyewitnesses or other direct evidence, and the State is allowed to rely exclusively on circumstantial evidence in proving its case." Godfrey, 2010 VT 29, ¶ 18. "So long as the jury by way of a process of rational inference could conclude beyond a reasonable doubt that defendant committed the acts . . . charged, we will not disturb the jury's verdict." Id. (quotation omitted).

¶ 36. We conclude that the evidence fairly and reasonably supported defendant's conviction for aggravated murder, which required the State to prove that defendant unlawfully caused the deaths of Steven and Jamis, with the intention to kill or do great bodily harm, or with a wanton disregard for the likelihood that her actions might cause their deaths. 13 V.S.A. § 2301 (defining murder); id. § 2311(a)(3) (defining aggravated murder to include commission of two murders at same time); State v. Baird, 2017 VT 78, ¶ 4, 205 Vt. 364, 175 A.3d 493 (noting mental states required for second-degree murder are intent to kill, intent to do great bodily harm, or wanton disregard for human life).

¶ 37. There was ample evidence that defendant unlawfully caused Steven's and Jamis's deaths. On the night Steven and Jamis were murdered, defendant called her friend and told him, "I just shot Steve and Jamis." She then called her sister and said, "I shot them, I think they're

10

dead, there's blood, there's so much blood." While in police custody, she talked to herself about having killed them.[1] For instance, she mentioned Steven beating her, then said, "ya understand the reason I shot the motherfucker oops wait a minute, nope, I didn't say anything." Later, she reflected that "I got Jamis better." There was no evidence that anyone else was in the home at the time of the murders. Defendant's DNA was found on the nine-millimeter gun that fired the shots that killed Steve and Jamis. The guns in the home, including the one used for the murders, were stored on the upper floor where defendant, who was upstairs that evening, would have had easy access to them, while a third party likely would not. While in police custody, defendant asked for the "loaded nine-millimeter," showing she was familiar with the murder weapon. While no blood was found on defendant, no blood was found on the murder weapon, either—suggesting, as the State's expert indicated was possible, that there was no back spatter on the shooter. And although she was drunk, it is not improbable that defendant was able to fire all fifteen shots into Steven and Jamis, given that they were shot from no more than a few feet away.

¶ 38.   Moreover, there was sufficient evidence from which a jury could conclude that defendant caused Steven's death with intent to kill or do great bodily harm, or at the very least with wanton disregard for risk to his life. The evidence fairly supported the State's theory at trial that defendant intended to kill Steven because she was angry that he had broken off their engagement, was inflamed by his relationship with neighbor, and was upset that he had beaten her. Her diary—which she told officers would "shed a whole lot of light on this"—showed that she was angry at Steven and may have stalked and physically hurt him in the month leading up to the murders. Her diary entry reflecting that she had previously told Steven she would kill him, and her statements to police that she shot him because he abused her, strongly support an inference that she intended to kill him. The evidence that Steven was shot twelve times, while

---

[1] We address the arguments in the order they were raised by defendant, but the analysis in this section reflects our conclusion, set forth more fully below, that the trial court did not err in declining to suppress various statements defendant made while in police custody.

11

Jamis was shot only three, supports the State's theory that the killer was someone who was primarily motivated to kill Steven, as defendant was—she reflected in the cruiser that she had a reason to kill Steven, but she was shocked that she had killed Jamis. Finally, the fact that Jamis was hit only in the head, while Steven was hit not just in the head, neck, and chest but also four times in the groin, fits with the State's theory that defendant killed Steven out of frustration with their failed romantic and sexual relationship and rage at his perceived infidelity.

¶ 39.   Likewise, there was sufficient evidence for a jury to conclude that defendant caused Jamis's death with intent to kill or do great bodily harm, or at the very least with wanton disregard for risk to his life. The fact that Jamis died by three shots to the head at close range from multiple angles indicates his death was no accident but was rather intentional. See Brochu, 2008 VT 21, ¶ 33 (holding that given evidence that killer inflicted multiple wounds on decedent, killing "was unquestionably intentional").

¶ 40.   In sum, defendant's repeated confessions, her opportunity and motive, and the forensic evidence tying her to the murder weapon were sufficient for a jury to conclude beyond a reasonable doubt that she killed Steven and Jamis.

## II.  Custodial Interrogation Without Counsel

¶ 41.   Defendant next argues that her statements to police in the cruiser after she requested a lawyer and in the processing room were the product of custodial interrogation without counsel after she had invoked her right to an attorney, and thus their admission violated her rights under the Fifth Amendment of the U.S. Constitution, Article 10 of the Vermont Constitution, Vermont's Public Defender Act, and the Due Process Clause of the Fourteenth Amendment.[2]  She argues that she invoked her right to counsel soon after police took her into

---

[2]  Because defendant does not argue that the suppression analysis differs under Article 10 or the Public Defender Act from under the U.S. Constitution, we do not separately analyze these claims. The protections that the Fifth Amendment and Article 10 provide against self-incrimination are coextensive. State v. Hieu Tran, 2012 VT 104, ¶ 11 n.1, 193 Vt. 148, 71 A.3d

12

custody, and that the police's subsequent questions and comments qualified as interrogation because the police knew or should have known their conduct was reasonably likely to elicit an incriminating response from her.

¶ 42.   Prior to trial, defendant moved to suppress all of her statements made to police on November 18 after she requested a public defender.[3]   She argued that the officers used tactics that were tantamount to custodial interrogation because they were designed to keep her talking while she was in the cruiser and processing room.   Because she made the statements in response to this custodial interrogation without the benefit of counsel after she had invoked her right to an attorney, she argues they should be suppressed.   After a hearing, the court held that, while her statements in the cruiser and while alone in the processing room were made voluntarily and not in response to any conduct or questioning by the police, later statements she made in response to questioning (which are not at issue in this appeal) were in response to custodial interrogation, and this questioning violated her rights to counsel under the U.S. Constitution and the Public Defender Act.   Accordingly, the court held the statements in the cruiser and processing room were admissible, but suppressed the later statements made during formal questioning.

¶ 43.   We review the trial court's decision on a motion to suppress using "a two-step analysis.   We defer to the trial court's factual findings and will affirm them unless clearly erroneous."   Hieu Tran, 2012 VT 104, ¶ 10 (citation omitted).   The underlying question of

---

1201.  We have adopted the protections of Miranda, but "have not gone further and found a violation of the Miranda principles in circumstances where the United States Supreme Court has not done so."  State v. Rheaume, 2004 VT 35, ¶ 15, 176 Vt. 413, 853 A.2d 1259.  Likewise, "[t]he [Public Defender Act] does not establish a set of substantive rights in addition to the Miranda right to have counsel present at questioning."  State v. Robitaille, 2011 VT 135, ¶ 14, 191 Vt. 91, 38 A.3d 52 (quotation and alteration omitted).

[3]  While there is some question as to when defendant first invoked her right to a public defender, we do not resolve this question because we hold that none of the statements she now seeks to suppress were made in the context of custodial interrogation, and thus her right to a public defender had not yet attached.  See Robitaille, 2011 VT 135, ¶ 18 (explaining right to counsel attaches when person is subjected to custodial interrogation).

13

whether defendant was subjected to custodial interrogation is a legal one, and our review is plenary and nondeferential. Id. We determine whether a suspect was subject to interrogation by assessing the totality of the circumstances. Rheaume, 2004 VT 35, ¶ 12.

¶ 44. We hold that the trial court properly denied suppression of defendant's statements in the police cruiser and processing room prior to the commencement of formal questioning. When she made the statements, defendant was in custody, and partway through the statements, she invoked her right to counsel—but police at no point did or said anything reasonably likely to elicit incriminating statements, meaning the statements were not the product of custodial interrogation. Because suppression is only warranted as a remedy for custodial interrogation in violation of the rights articulated in Miranda, it is not warranted under these circumstances. We therefore affirm.

¶ 45. If a person in custody invokes the right to an attorney, interrogation must stop and any subsequent statements the person makes in response to custodial interrogation must be suppressed. Miranda v. Arizona, 384 U.S. 436, 467-68, 473-74 (1966). "Interrogation" encompasses all "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). A defendant's statement to police need only be suppressed if it was the product of custodial interrogation. Miranda, 384 U.S. at 478. Thus, even where a defendant invoked the right to counsel but later made incriminating statements in no way elicited by state actors, the statements are admissible. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (holding defendant must not be interrogated after invoking right to counsel unless defendant "initiates further communication, exchanges, or conversations with the police"); State v. Yoh, 2006 VT 49A, ¶ 13, 180 Vt. 317, 910 A.2d 853 (holding defendant's statements after invoking right to counsel were admissible where defendant made statements on his own initiative). Defendant's invocations of the right to counsel, and the

14

fact that the officers did not advise her of her <u>Miranda</u> rights during the relevant period, are not dispositive if the police did not actually interrogate her. <u>Robitaille</u>, 2011 VT 135, ¶ 18.

¶ 46.    The police did not interrogate defendant during the time she made the statements she now seeks to suppress. Neither the fact that she was in custody, nor the officer's mundane interactions with her, suggest interrogation. <u>State v. Webster</u>, 2017 VT 98, ¶ 11, __ Vt. __, 179 A.3d 149 (holding where defendant in custody talked with officer and "made several apologies and incriminating statements before he was subjected to interrogation . . . those statements were . . . outside the scope of <u>Miranda</u>'s protections"). The simple fact that she was in custody when making the statements does not mean she made them in response to custodial interrogation. While we recognize the "often intimidating and suggestive atmosphere inherent in police custody," custody alone does not constitute interrogation; there must be a " 'measure of compulsion above and beyond that inherent in custody itself' " to rise to that level. <u>In re J.E.G.</u>, 144 Vt. 309, 313, 476 A.2d 130, 132 (1984) (quoting <u>Innis</u>, 446 U.S. at 300). In <u>State v. Karov</u>, we considered whether <u>Miranda</u> allowed the admission of statements a defendant made in the presence of police driving him to the barracks in a cruiser. 170 Vt. 650, 756 A.2d 1236 (2000) (mem.). The defendant was accused of, among other things, aggravated domestic assault on his ex-wife, and he had not yet received <u>Miranda</u> warnings. "He made comments to the police to the effect of 'I admit she got thumped last night' and 'a higher power told me to do it.' " <u>Id</u>. at 653, 756 A.2d at 1240. We held that, while the defendant was in custody at the time, because there was no evidence that the police did anything to elicit the comments, the comments were not made in response to custodial interrogation and thus were properly admitted. <u>Id</u>. at 654, 756 A.2d at 1240. Likewise here, although the atmosphere in the cruiser and processing room may have been "intimidating and suggestive," that is insufficient to warrant finding custodial interrogation because the officers said and did nothing to elicit the defendant's statements. <u>In re J.E.G.</u>, 144 Vt. at 313, 476 A.2d at 132. She made many of them without an officer even in the

15

car or room with her; and those that she did make in officers' presence were not in apparent response to anything they said or did but rather were part of her self-reflective monologue.

¶ 47. The officers' brief responses to defendant's questions, their offers of water and tissues, their statements that they would be with her soon, and even their conversations with defendant about getting her red wine and cigarettes were not interrogation. This casual conversation was not reasonably likely to elicit an incriminating response and was thus not interrogation. State v. FitzGerald, 165 Vt. 343, 345, 683 A.2d 10, 13 (1996) (holding "incriminating statement made in the course of casual conversation is not the product of interrogation"). In FitzGerald, the defendant sought to suppress a statement he had made to an officer while the officer was transporting him. The defendant inquired where his friend, who he had been with shortly before murdering his wife, was. When the officer replied, "He's in Texas, why?" the defendant said, "That's good, he had nothing to do with it." Id. at 345, 683 A.2d at 12. Based on the totality of the circumstances, we held that the officer's question of "why?" was not interrogation because the defendant had initiated a casual conversation with the officer; the officer responded to the defendant's question with an ordinary figure of speech; and there was no evidence the officer "knew or should have known that his words were likely to elicit an incriminating response." Id. at 345-46, 683 A.2d at 13.

¶ 48. The totality of the circumstances here shows the statements defendant made while in the police cruiser and processing room were likewise not made in response to any statement or action by police. There is no indication that the police did anything that was reasonably likely to elicit defendant's statements. Before defendant made her first apparent confession—referring to Steven beating her and then saying "ya understand the reason I shot the motherfucker"—the officers had just asked her routine questions, including asking if she was ok and if there was anyone else in the house; given her routine instructions, such as to put her hands behind her back to be handcuffed; and told her they would not shoot her when she suggested they should.

16

Likewise, throughout the evening, the officers said little to defendant except to answer her questions, such as when she asked the trooper where they were going, and he said they were going to his office in West Brattleboro, or when officers at the station helped her get water and tissues, or told her they would be with her soon. These brief and routine interactions, and the reassurance that the police would not shoot her, were not reasonably likely to elicit incriminating statements.

¶ 49. While the officers did, as defendant says, "repeatedly re-initiate[] contact" with her, as when they talked with her on several occasions about her desire for more wine and cigarettes, it was not reasonably likely that these questions would elicit an incriminating response, nor did they appear to have that effect. Although defendant argues that the officers talked to her as part of a calculated plan to keep her talking, it does not appear that defendant needed any encouragement to keep talking to herself, nor did the officers provide much. Instead, defendant's conversations with the officers appear to have been brief distractions from her ongoing monologue that evening: her sometimes-incriminating patter to herself after speaking with the officers was generally similar to her patter to herself beforehand, and the officers' questions were not related to the substance of that patter. Lacking any apparent causal nexus between the officers' brief conversations with her and her subsequent statements, some of which were incriminating (as when she told an officer she would like wine, he left, and then she said to herself "you killed the motherfucker . . . he's dead, dead as a board, he put you through amazing amounts of hell"), we cannot find these conversations amounted to interrogation.

¶ 50. We need not and do not decide whether holding someone in custody without questioning them for an extended period of time may under some circumstances be tantamount to custodial interrogation on the basis that the circumstances are likely to lead a suspect to make incriminating statements. We conclude that this is not such a case. The elapsed time between defendant's initial arrest and the formal questioning was around two and a half hours. That

17

includes the time she spent sitting in the police cruiser while officers secured the scene, as well as the time to transport her to the police barracks and prepare to interrogate her. The officers left her alone in safe environments and checked on her periodically. Even if an extended period of non-questioning could be tantamount to custodial interrogation, the circumstances of this case would not rise to that level.

### III.  Voluntariness of Defendant's Statements

¶ 51.  Finally, defendant argues that her statements to police should have been suppressed because they were the result of impermissible coercion by the police that deprived her of due process. She argues that she was intoxicated to the point of thinking someone was coming to kill her dog and the police were taking her to the woods to kill her, and that her dog and Steven were in the car with her; she experienced the trauma of seeing her ex-fiancé and son dead in her home; she received no <u>Miranda</u> warnings; and she was detained incommunicado despite her many requests for counsel. She contends that the totality of these circumstances overpowered her will, making her statements involuntary and thus inadmissible under the Due Process Clause of the Fourteenth Amendment.

¶ 52.  Prior to trial, defendant moved to suppress her statements on similar grounds. The court held that all of her statements that night in the cruiser and processing room, up until the point formal questioning commenced, were voluntary because they were not the product of improper police coercion, and were thus presumptively admissible.

¶ 53.  The applicable law is well settled. When a defendant challenges the admission of "a confession or inculpatory statement, the prosecution must establish by a preponderance of the evidence that the confession or statement was made voluntarily." <u>State v. Reynolds</u>, 2016 VT 43, ¶ 12, 201 Vt. 574, 145 A.3d 1256 (quotation omitted). A "statement is involuntary if coercive governmental conduct played a significant role in inducing" it. <u>State v. Pontbriand</u>, 2005 VT 20, ¶ 21, 178 Vt. 120, 878 A.2d 227. Involuntary confessions must be excluded from

18

evidence. Yoh, 2006 VT 49A, ¶ 11. Suppression in this context is a remedy for police misconduct. Colorado v. Connelly, 479 U.S. 157, 163 (1986) (explaining Due Process Clause prohibits "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, [that] are so offensive to a civilized system of justice that they must be condemned" (quotation omitted)).

¶ 54.    We consider the totality of the circumstances in determining whether a defendant made a statement voluntarily, Reynolds, 2016 VT 43, ¶ 13, paying attention to factors including the defendant's access to a lawyer and whether Miranda warnings were given, Procunier v. Atchley, 400 U.S. 446, 453-54 (1971), as well as the length of detention and nature of police questioning and treatment of the defendant. See Pontbriand, 2005 VT 20, ¶ 21 (holding statement made to officers during daytime, in semi-public space, in response to brief questioning by two officers was voluntary). The defendant's characteristics are also highly relevant to determining whether police acted appropriately, and "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the voluntariness calculus." Connelly, 479 U.S. at 164 (quotation omitted). But the court's awareness that police may use "subtle forms of psychological persuasion" does not alone "justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional voluntariness." Id. (quotation omitted).[4]

¶ 55.    We review a trial court's determination as to voluntariness without deference, as the U.S. Supreme Court has made clear that voluntariness is a legal question. Reynolds, 2016 VT 43, ¶ 14.

---

[4] As the U.S. Supreme Court put it, a defendant's mental state can never alone justify suppression because it would enforce no constitutional guarantees—unless "we were to establish a brand new constitutional right—the right of a criminal defendant to confess to [a] crime only when totally rational and properly motivated." Id. at 166.

¶ 56. With these considerations in mind, we conclude that defendant's statements in the cruiser and processing room were voluntary. Her vulnerability, while relevant to the totality analysis, did not itself render her statements involuntary. The record does not support the suggestion that the police improperly took advantage of her vulnerability or in any way coerced her statements, including by holding her for two and a half hours without a lawyer.

¶ 57. We recognize that given her highly intoxicated and emotional state, we must be particularly attuned to the possibility that defendant's inculpatory statements were the product of subtle coercion. See In re Sanborn, 545 A.2d 726, 732 (N.H. 1988) (holding defendant's "mental state may be highly significant in determining whether any given police conduct was overbearing in its effect," but "proof that a confession or admission was the product of a defendant's mental derangement or mental deficiency is no basis to exclude the confession or admission from evidence"). For example, where officers persistently questioned a suspect who had attempted suicide by taking a large quantity of Xanax before his arrest, and was falling in and out of consciousness during the interview to the extent that officers had to keep waking him up, the court found the questioning coercive. United States v. Taylor, 745 F.3d 15, 25 (2d Cir. 2014). But where a "drug-addled" defendant was arrested and told the arresting officer that he "wanted to testify to something" and, when the officer told him he could write it down, he wrote a confession, the court found no coercion. United States v. Díaz-Rosado, 857 F.3d 116, 122 (1st Cir. 2017).

¶ 58. Here, officers had done little more than handcuff defendant and take her to the cruiser when she made her first inculpatory statement, "ya understand the reason I shot the motherfucker oops wait a minute, nope, I didn't say anything, I didn't say anything." As where the "drug-addled" defendant made a voluntary confession, police did nothing to coerce defendant's statements, and thus suppression is not appropriate even despite her intoxication. See id.

20

¶ 59. While defendant argues her detention without a lawyer was coercive state action, as we have previously held, " 'custody alone has never been enough in itself to demonstrate a coerced confession.' " State v. Weisler, 2011 VT 96, ¶ 39, 190 Vt. 344, 35 A.3d 970 (quoting United States v. Watson, 423 U.S. 411, 424 (1976)). Moreover, a defendant does not have an immediate right to counsel upon arrest, and failure by police to immediately furnish counsel is not necessarily coercive. See Miranda, 384 U.S. at 474 (holding police do not violate Fifth Amendment right against self-incrimination if they do "not provide counsel during a reasonable period of time in which investigation in the field is carried out," if they refrain from interrogation).

¶ 60. Even where a defendant is emotionally unstable and held for several hours at a police station without a lawyer, we have not found custody to be so coercive as to make a suspect's statements involuntary. In State v. Smith, the mentally ill murder suspect was held in a small room at a police station, in the presence of several officers, "for a number of hours" after requesting counsel because his attorney could not be located. 140 Vt. 247, 254, 437 A.2d 1093, 1096 (1981). During that time, he said, "Jesus Christ, you'd think I'd killed the President of the United States." Id. We held there was no evidence he "was cajoled or tricked into speaking" but rather that, from the evidence, it appeared his statement was voluntarily made and "not the result of coercive police practices." Id. at 256, 437 A.2d at 1097.

¶ 61. As in Smith, defendant was emotionally unstable; she was in custody for hours; and she had requested counsel but was not able to speak to an attorney. While prolonged incommunicado detention could in certain circumstances overbear a suspect's will, we do not find that two and a half hours of detention, during which officers gave defendant water and tissues and allowed her to use the restroom, were coercive. Given that this was a double-homicide case in which, as the State argues, officers needed time to familiarize themselves with the facts before questioning defendant, the delay here was not so excessive as to render

21

defendant's statements involuntary.  Thus, as in <u>Smith</u>, we conclude that police did not coerce defendant into speaking, and do not suppress her statements as involuntary.

<u>Affirmed</u>.

FOR THE COURT:

<br>

Associate Justice