NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 14

No. 2015-437

| | |
|---|---|
| In re Gregory S. FitzGerald | Supreme Court |
| | On Appeal from<br>Superior Court, Chittenden Unit,<br>Civil Division |
| | September Term, 2019 |

Dennis R. Pearson, J.; Helen M. Toor, J. (judgment on remand)

Matthew F. Valerio, Defender General, and Kelly Green and Annie Manhardt, Prisoners' Rights Office, Montpelier, and Gregory S. FitzGerald, Pro Se, Baldwin, Michigan, for Petitioner-Appellant.

David Tartter, Deputy State's Attorney, Montpelier, for Respondent-Appellee.


PRESENT: Eaton and Carroll, JJ., and Dooley, J. (Ret.), and DiMauro and Manley, Supr. JJ. (Ret.), Specially Assigned

¶ 1. **CARROLL, J.** Petitioner Gregory FitzGerald[1] appeals from two superior court decisions entering judgment for the State on his petition for post-conviction relief (PCR). On appeal, petitioner argues that he was prejudiced by the cumulative effect of errors trial counsel made during his 1994 criminal trial. He also alleges that the State knowingly presented false evidence at his trial. We affirm.

---

[1] Aside from petitioner, after a witness with the surname FitzGerald is introduced, he or she will thereafter be referred to by his or her first name. This is necessary to avoid confusion among the multiple witnesses with the surname FitzGerald.

## I.  Criminal Conviction

### A.  Factual Background

¶ 2.    Our decision relies heavily upon the evidence produced at trial.  The testimony demonstrated the following.  In 1992, petitioner was placed on academic dismissal at the University of Texas.  He continued to reside in Texas, and, for over a year, misled his wife—Amy FitzGerald, who was living in Vermont—into believing that he was still enrolled in school.  In fact, Amy was under the impression that petitioner would graduate in the spring of 1993 and had plans to fly to Texas for the occasion.  In January 1993, petitioner falsely reported that Amy's jeep had been stolen and collected about $4000 in insurance proceeds.  During his time in Texas, petitioner also maintained a secret relationship with another woman.

¶ 3.    In April 1993, petitioner enlisted Denise O'Brien—a friend of his from Texas—to help in his plan to murder Amy.  O'Brien testified that petitioner asked her to drive to Connecticut, pick him up from the airport, drop him off at Amy's house in Vermont, and then "return to pick him up at a given time."  O'Brien further testified that petitioner told her that he planned to hit Amy in the head with a baseball bat and "make it look like it was a bathing accident" by spreading "cat litter around the bathroom floor to make it seem like she had slipped and fallen while trying to get into the bath."

¶ 4.    On May 1, 1993, petitioner learned that the San Antonio Police Department had found Amy's jeep at a storage unit registered in his name and impounded the vehicle.  On the morning of May 2, O'Brien received a phone call from petitioner saying that he had to leave right away.  As we explained on direct appeal, petitioner then engaged in a "scheme involving multiple rental cars and an elaborate schedule of air travel, designed to conceal his involvement in the crime."  State v. FitzGerald, 165 Vt. 343, 344, 683 A.2d 10, 12 (1996).  Accordingly, on the afternoon of May 2, petitioner asked his landlord to drop him off at Alamo Car Rental in San

Antonio, Texas, telling his landlord that he needed to get work done on his pickup truck. Petitioner proceeded to rent a white car.

¶ 5. On May 4, a North Carolina State Trooper pulled over the same white car for speeding, and identified petitioner as the driver. The trooper testified that petitioner said he was headed to Vermont with his friend Richard Rodriguez to visit his wife. After the state trooper noticed a court document in petitioner's car indicating that Rodriguez was arrested on May 3 in New Orleans, petitioner explained that Rodriguez had spent the previous night in New Orleans while he flew back to Texas to pick up a check he had forgotten.

¶ 6. On May 5, petitioner purchased an airline ticket to Austin, Texas at Bradley International Airport in Hartford, Connecticut. The next day, petitioner was seen in Texas driving a small U-Haul truck. Meanwhile, an employee at Bradley International Airport, spotted petitioner's white rental car in a short-term parking lot. The employee was directed to leave a note on the car telling someone to "go back and check in at the Budgetel Hotel" because "[y]our friend's plane has had mechanical problems and he won't be in until 11:30 at night." Rodriguez checked into the Budgetel Hotel on May 6 and left the next morning. Records indicate that the white rental car left the short-term parking lot at Bradley International Airport sometime on May 7. In the early evening of May 7, Rodriguez checked into a Burlington hotel room with another male.

¶ 7. During the early morning hours of May 8, Amy's neighbors were awakened by the sound of a woman screaming. Amy's body was discovered on May 11, and an autopsy indicated that she had been asphyxiated two to four days earlier. That same morning, O'Brien saw petitioner in Texas. She testified that petitioner had a scratch on his arm and told her that "Amy was dead, and that everything went okay but it wasn't as easy as he thought it would be. She fought him all the way." After being told later that day that there had been an incident in Vermont with Amy, petitioner told his landlord that he was going to catch the first flight out of Texas he could. Although there were numerous flights available from Texas to Vermont, petitioner called his

3

landlord that evening and said he could not find a flight. Petitioner then drove from Texas to Massachusetts in a different car he rented from Alamo Rental on May 11.

¶ 8.    On May 13, Elaine FitzGerald, petitioner's sister-in-law, saw petitioner at her home in Massachusetts. She noticed that one of his hands was bleeding and the other one had several scratches. On May 14, petitioner drove from Massachusetts to Vermont with Amy's parents. Upon arriving in Vermont, he was interviewed at the Shelburne Police Station by Detective Andi Higbee of the Burlington Police Department. Detective Higbee noticed that petitioner had several injuries: a cut on his right middle finger, which was starting to scab; a circular abrasion on the palm of his right hand; and a light vertical scratch on his right cheek. Petitioner told Detective Higbee that he was enrolled in school at the University of Texas, even though he had been placed on academic dismissal over a year earlier.

¶ 9.    Detective Higbee interviewed petitioner again the next day. Petitioner told the detective that after he learned about the incident involving Amy on May 11, he decided to go to Vermont but was unable to find a flight until May 13. The record indicates, however, that there were several flights available from Texas to Vermont on May 11. Petitioner also told Detective Higbee that on May 7, he went to a garage where his pickup truck was being repaired and then spent several hours at a bar where "nobody recognized him." On May 16, Detective Higbee spoke with petitioner for a final time at the Williston police barracks. During this last interview, petitioner told Detective Higbee that he went to Louisiana to bail Rodriguez out of jail on May 7.

¶ 10.    Petitioner returned to Massachusetts on May 16 for Amy's funeral, which was on May 18. Robert Saville, petitioner's cousin, testified that petitioner confessed to him the day after the funeral. He testified that petitioner offered him $15,000 to drive to Vermont and call the police to tell them they had the wrong suspect. Petitioner told Saville to tell the police that Amy was killed in the bedroom and then dragged into the bathroom, which was "something about the murder that no one else [would] know[]." Petitioner's brother Leo FitzGerald testified that petitioner told

4

him on the early morning hours of May 20 that he went up to Amy's apartment, "[t]he door was open, I went inside, [and] she was already dead." That same day, petitioner was charged with the first-degree murder of Amy FitzGerald.

<h3 align="center">B. Trial</h3>

¶ 11. As relevant for the purposes of this appeal, the following events occurred over the course of a fourteen-day trial.

¶ 12. During jury draw, petitioner's counsel explained that petitioner himself would decide whether to testify at trial. He engaged in the following refrain on three occasions:

> The other question which I always ask is—because I don't know the answer—is whether or not my client takes the stand. I start with the presumption that he will not take the stand in every case. Time may come when he will or not. That's a decision that he makes, albeit, I'm sure he'll elicit my advice in the matter and there's a myriad [sic] why a defendant will or will not take the stand.

On each occasion, trial counsel asked the jury if they would hold it against his client if he decided not to testify. Trial counsel also repeatedly emphasized during jury draw that it was the State's burden to prove petitioner's guilt beyond a reasonable doubt. During opening statements, trial counsel argued that the State could not meet this burden, emphasizing that there was "not a single physical fact of any sort that tie[d] [his] client to th[e] homicide." Trial counsel conceded, however, that his client was not "the most honorable of people. I don't promise you that you'll go away feeling that he is a worthwhile, good, positive person you want as a best friend. There are a lot of things wrong in this case, a lot of things that will be revealed in this case . . . ."

¶ 13. The state solicited testimony from O Brien, Federal Bureau of Investigation Agent Wayne Oakes, Detective Andi Higbee, and petitioner's brother Leo. First, as detailed above, supra, ¶¶ 3, 7, O'Brien testified that petitioner (1) enlisted her to assist with murdering Amy, (2) described key details about how he planned to commit the murder, including his plan to use kitty litter, and (3) confessed to her that he killed Amy.

¶ 14. Next, Agent Oakes testified that he was a certified specialist in the field of microscopic hair comparison. Before trial counsel objected, the agent began to explain microscopic hair analysis by analogy to the human face:

> Most people's faces have two eyes, two ears, a nose and a mouth. Most hairs have these characteristics . . . but you and I can recognize people that we're acquainted with because we can recognize subtle differences in their facial features, and an experienced hair examiner—

Agent Oakes further testified that "by looking at these characteristics . . . [he was] able to correctly associate question hairs with known hair samples." Using his "expertise" as a hair examiner, the Agent explained that he analyzed hair found in Amy's bathroom sink and concluded that the "hair was consistent with hair originating from [petitioner]."

¶ 15. Third, Detective Andi Higbee of the Burlington Police Department testified that during an interview petitioner <u>volunteered</u> information about the condition of Amy's bathroom. The following exchange occurred:

> [Prosecutor:] You did not ask him a question, correct?
>
> [Detective Higbee:] No.
>
> [Prosecutor:] And [petitioner] said something else about the apartment?
>
> [Detective Higbee:] Yes.
>
> [Prosecutor:] And what did he say?
>
> [Detective Higbee:] The condition of the bathrooms.
>
> [Prosecutor:] And what did he say specially about that?
>
> [Detective Higbee:] He indicated to us that they were messy, that during his last visit he had decided to take a bubble bath because his neck had hurt. He said when he had to do that, he had to pick out hair and also kitty droppings from the bathtub to—or from the bathroom in order to do that.

6

¶ 16. Finally, Leo testified that petitioner admitted to seeing Amy dead in her apartment. Trial counsel began his cross-examination by asking, why—despite talking to the police in May and July 1993—Leo did not tell police about petitioner's admission until March 1994. In response to further questioning, Leo acknowledged that "[b]efore the first of the year," i.e. 1994, he was offered $10,000 for the movie rights to his story. Trial counsel suggested that this cast serious doubt on Leo's credibility: "And now you want us to understand that on the 17th of March of this year for the first time you told somebody something additional to the effect . . . [that petitioner told you] 'I went up there to get some of my things. The door was open and she was already dead?'"

¶ 17. During closing arguments, the State referenced testimony from all of these witnesses. First, the State emphasized that "the detail [O'Brien] had regarding what the [petitioner] said he was going to do [was] strikingly similar . . . to the crime scene." The State characterized Agent Oakes's testimony as establishing that "hair consistent" with petitioner's was found in the bathroom sink. The State then emphasized that petitioner volunteered information about the condition of Amy's bathroom to Detective Higbee:

> [T]hink about what the [petitioner] said to Detective Higbee, not in response to a question, but just a statement, and that was, I took a bubble bath the last time I was up there, and I had to actually clean kitty poop out of the tub, pick hairs out of the drain. Why did he say that?. . . . He wasn't asked that question. . . . Could it be because he's concerned with trace evidence?

Finally, the State argued that Leo's delay in telling the police about petitioner's admission made his testimony more credible:

> Leo FitzGerald, [he doesn't] tell the cops back in May. [He doesn't] tell the cops in July. Why? Its logical. Because [he's] afraid. . . . Leo FitzGerald, he's torn. This is his brother. Look at what was dropped on his lap. Was this one of the hardest things that Leo FitzGerald has ever done in his life? Of course it was. It doesn't mean that [he's] not being truthful to you. It means it was a difficult decision that dealt with the division of a family and putting evidence in that's going to hurt your brother, but it doesn't mean that it's not true. In fact, we submit the opposite, that it gives credibility to what [he's] told you.

7

¶ 18.   Petitioner was subsequently convicted of first-degree murder and sentenced to life without parole on August 2, 1994.  We affirmed his conviction on direct appeal, emphasizing that the State presented "strongly probative and abundant" evidence of petitioner's guilt.  FitzGerald, 165 Vt. at 351, 683 A.2d at 16.

## II.  PCR Proceedings

¶ 19.   Almost immediately after we affirmed his conviction on direct appeal, petitioner and appointed counsel each filed separate original and amended PCR petitions.  These "petitions together raised no less than thirty separate claims divided into four general categories: prosecutorial misconduct, consisting of essentially five separate claims; ineffective assistance of trial counsel, comprising eighteen instances of alleged error; ineffective assistance of appellate counsel, with six claims; and sentencing error."  In re Gregory FitzGerald, 2007 VT 51, ¶ 4, 182 Vt. 639, 945 A.2d 825.  The case languished for almost ten years until the PCR court granted the State's motion for summary judgment in 2005.  As to the specific ineffective assistance of counsel claims at issue in this appeal, the PCR court concluded that petitioner had not met his burden because he "provided no evidentiary support beyond conclusory allegations in response to the State's summary judgment motion."  On appeal, we affirmed the PCR court's judgment except as to petitioner's specific claims that trial counsel's assistance was ineffective because he failed to "conduct a pretrial investigation, prepare a defense, or interview witnesses."  We remanded these three claims to the PCR court for further proceedings.  Id. ¶ 4.

¶ 20.   On remand, Judge Pearson conducted evidentiary hearings where he heard testimony from petitioner's expert witness, Ernest Allen—"a highly experienced and well-regarded Vermont criminal defense attorney."  Allen testified that, in his opinion, trial counsel's performance at petitioner's criminal trial "f[e]ll below accepted standards for competent criminal defense counsel" in several ways.  First, Allen testified that he was "startle[d]" by trial counsel's

8

conduct during jury draw and opening statements. He explained that although it is "sort of the industry standard" to lay the blame for the client's decision to testify on the defense attorney, trial counsel told the jury it was petitioner's decision. In addition, Allen explained that one of the ideas of the jury draw is to "humanize" your client to the jury. Trial counsel's statements, however, were "all negative." As the PCR court explained:

> In Allen's view[,] [trial counsel] in his opening statement (and to some extent later in his closing argument) [erred] by going too far in attempting to 'take the sting' out of what was expected to be adverse evidence by essentially conceding the facts . . . but downplaying the significance as simply being 'not so horrible,' and meanwhile not doing much to 'humanize' [p]etitioner and emphasize 'common traits' he would have with most people.

¶ 21. Second, Allen testified that trial counsel's cross-examination of several key witness—including O'Brien and Leo—was subpar. He explained that O'Brien's testimony was "devastating" and trial counsel had to attack her credibility. Although trial counsel questioned O'Brien at "considerable length" on her inconsistent statements to the police—namely, that she did not initially disclose to police that she knew the victim was Amy—trial counsel failed to question how she knew the details of the crime scene. Allen conceded that trial counsel did a "better job" of cross-examining Leo by establishing that he had a financial incentive to testify. But Allen opined that trial counsel could have established this link during opening statements and jury draw. Allen provided no testimony about trial counsel's cross-examination of Detective Higbee.

¶ 22. Third, Allen explained that trial counsel failed to present a coherent theory of defense: "[T]here's no theory that is first sort of developed through voir dire and then presented in the opening . . . developed through the cross-examination and then sealed in the closing argument . . . ." On cross-examination, the State questioned Allen as to what trial counsel's theory of the defense should have been:

> Q. [I]f I understood your testimony correctly, [you said] that there was no coherent, articulated theory of defense?

9

A. Yes

Q. If you had done this trial, what would your coherent articulated theory of defense have been?

A. Why are these people lying about [petitioner], and unfortunately, you'd have to come up with two different reasons why people were lying: The relatives for the money and . . . O'Brien for a reason of revenge of some sort—

Q. Which you don't know what that was?

A. I don't.

¶ 23.   Although the scope of the remand order before the PCR court included only three claims—namely, that trial counsel's assistance was ineffective because he failed to "conduct a pretrial investigation, prepare a defense, or interview witnesses," id. ¶ 4—petitioner, representing himself, asked Allen about whether trial counsel accurately conveyed the State's plea offer.  With some hesitation, Allen testified that he thought trial counsel was "constitutionally deficient" because he did not accurately convey the State's offer.

¶ 24.   Considering Allen's testimony, the PCR court concluded that there were:

  [F]our different areas in which [trial counsel's] performance . . . fell short of minimal expectations for competent defense counsel performance: (1) failure to adequately relate, and advise [p]etitioner with regard to the pretrial plea offer made by the State; (2) failure to conduct adequate pretrial investigation, including the taking of additional depositions, which would have allowed [trial counsel] to more forcefully cross-examine the State's witnesses, which he then failed to do as to several key witnesses, most especially Denise O'Brien; (3) failure to develop and present to the jury—beginning at the voir dire proceedings, and especially during the opening statement—a 'coherent theory' of the defense which would have been consistent with arguable innocence, rather than mostly rely on the State's burden to prove its case beyond a reasonable doubt; and (4) the specific errors of (a) telling the jury that [p]etitioner himself would decide whether to testify and (b) conceding too much of [p]etitioner's adverse qualities or history without any countervailing presentation of more positive attributes.

Given the strong evidence against petitioner, however, the PCR court concluded that "none of [trial counsel's] errors . . . support the necessary finding of prejudice under Strickland such that the

10

'reasonable probability' of a different outcome has been proven." Final judgment was accordingly entered for the State. Petitioner timely appealed.

¶ 25. While petitioner's appeal of this decision was pending, the Defender General's Office received a letter from the United States Department of Justice (DOJ) as part of a review—conducted in association with the Innocence Project and the National Association of Criminal Defense Lawyers—of "microscopic hair comparison reports and testimony presented by the FBI." The letter explained that the "microscopic hair comparison analysis testimony . . . presented [at petitioner's 1994 criminal trial by Agent Oakes] included statements that exceeded the limits of science." The DOJ identified approximately six "inappropriate" statements that Agent Oakes made during his testimony, including his statement that he found hair in Amy's bathroom sink that was "consistent with [hair] originating from [petitioner]."[2] On May 3, 2017, we placed petitioner's appeal on waiting status and remanded his case to the superior court so he could "investigate this new evidence and amend his [PCR] petition."

¶ 26. Petitioner subsequently filed his third amended PCR petition alleging that (1) the State knowingly introduced false and misleading hair microscopy evidence at his 1994 criminal trial and (2) trial counsel's assistance was ineffective because he did not challenge the false hair evidence. To support his ineffective assistance of counsel claim, petitioner presented the affidavit of Paul Volk, who concluded that trial counsel's assistance was "more than arguably . . . per se" ineffective because he "apparently conducted absolutely no depositions at all in this case, relative

---

[2] The other "inappropriate" statements the FBI identified were: "All of the hairs that were of human origin that were of value for comparison purposes were consistent with being either the victim's or the [petitioner]'s"; "hairs vary greatly from one individual to the other, and this can form the basis of strong associations"; "it is very rare that I will find hairs from people that you can't tell them apart unless it's arranged in the same way as the [petitioner]'s hair"; "the hair found . . . [and] debris from the sink, is consistent with coming from [petitioner]"; "[c]ertainly the one hair that I, quote, matched to the [petitioner] was, in fact, a full length head hair." The Innocence Project and National Association of Criminal Defense Lawyers separately identified an additional inappropriate statement: "I'm able to correctly associate question hairs with known hair samples that we obtain."

11

to trial preparation." Had trial counsel adequately prepared and conducted depositions, Volk claims it would have been "highly likely" that trial counsel would have discovered "numerous flaws and non-scientific underpinnings regarding Agent Oakes' . . . trial testimony." Volk also opined that it was "quite clear" that the State "significantly relied" on the microscopic hair analysis "to the clear prejudice of [p]etitioner." The State did not produce any expert testimony on whether trial counsel's assistance was ineffective for failing to challenge Agent Oakes' testimony.

¶ 27. In April 2019, Judge Toor granted summary judgment to the State, explaining that petitioner could not establish that the State knowingly introduced false hair evidence in 1994 because hair evidence was not discredited until 2009. The court did not address whether trial counsel's assistance was ineffective for failing to challenge the hair evidence because it concluded that "it [was] clear beyond a reasonable doubt that the jury would have reached the same result . . . without the hair evidence." Following Judge Toor's summary judgment ruling, the Court took petitioner's appeal off waiting status.

¶ 28. On appeal are both Judge Pearson's December 2014 final merits decision and Judge Toor's April 2019 summary-judgment ruling. With regard to Judge Pearson's decision, petitioner argues that the PCR court erred in concluding that trial counsel's deficient assistance during the 1994 criminal trial was not prejudicial. With regard to Judge Toor's decision, petitioner argues the court erred in granting summary judgment to the State. He specifically argues that Agent Oakes "should have known about the weaknesses of microscopic hair analysis that others in his field had already acknowledged at the time of [petitioner's] trial." Similarly, petitioner argues that trial counsel's assistance was ineffective because "[f]or over a decade leading up to [petitioner's] conviction, defense attorneys throughout the nation were challenging the admission of hair microscopy evidence." Furthermore, petitioner argues that he was prejudiced by this error because "[b]y not contesting the faulty science underlying Oakes' testimony, defense counsel conceded

12

that [petitioner's] hair was found in the same room as Amy Fitz[G]erald's body," which "prohibited [petitioner] from presenting any plausible defense."

### III. December 2014 Final Merits Decision

¶ 29. 13 V.S.A. § 7131 provides prisoners with the right to collaterally attack a sentence that "was imposed in violation of the constitution or laws of the United States." Post-conviction relief is a "limited remedy, intended to correct fundamental errors in the judicial process." In re Burke, 2019 VT 28, ¶ 16, ___ Vt. ___, 212 A.3d 189 (quotation omitted); accord In re Grega, 2003 VT 77, ¶ 6, 175 Vt. 631, 833 A.2d 872 (mem.). It is "not a vehicle for addressing the petitioner's guilt or innocence." In re Laws, 2007 VT 54, ¶ 9, 182 Vt. 66, 928 A.2d 1210. "[Petitioner] bears the burden of proving by a preponderance of evidence, that fundamental errors rendered his conviction defective." In re Dunbar, 162 Vt. 209, 211, 647 A.2d 316, 319 (1994) (quotation omitted).

¶ 30. "The findings in a post-conviction relief decision are tested by the clearly erroneous standard." State v. Bristol, 159 Vt. 334, 336, 618 A.2d 1290, 1291 (1992). Accordingly, "[i]f the findings are supported by any credible evidence, and the conclusions reasonably follow therefrom, this Court will not disturb the trial court's judgment." In re Grega, 2003 VT 77, ¶ 6. "[W]hen the evidence is conflicting, we defer to the trial court's judgment." In re Combs, 2011 VT 75, ¶ 9, 190 Vt. 559, 27 A.3d 318 (mem.) Issues of law, however, are reviewed de novo. In re Bridger, 2017 VT 79, ¶ 9, 205 Vt. 380, 176 A.3d 489.

¶ 31. The basis for petitioner's PCR petition is that trial counsel's assistance was ineffective. "Vermont uses a two-part standard for evaluating an ineffective assistance of counsel claim—a test that is essentially equivalent under the United States and Vermont constitutions." In re Combs, 2011 VT 75, ¶ 9. First, petitioner must "show by a preponderance of the evidence that defense counsel's performance fell below an objective standard of reasonableness informed by prevailing professional norms." Id. (quotation omitted). In assessing whether counsel's

13

performance was deficient, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. ¶ 10 (quotation omitted). Because "[t]rial counsel are permitted a great deal of discretion in decisions regarding trial strategy," In re Dunbar, 162 Vt. at 212, 647 A.2d at 319, "expert testimony is generally required to show that an attorney's conduct fell below the standard of accepted practice in Vermont," In re Burke, 2019 VT 28, ¶ 19; see also In re Grega, 2003 VT 77, ¶ 16 ("Only in rare situations will ineffective assistance of counsel be presumed without expert testimony.").

¶ 32. "If this first burden is met, petitioner must further show that counsel's performance prejudiced the defense by demonstrating a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." In re Combs, 2011 VT 75, ¶ 9 (quotation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." In re Cohen, 161 Vt. 432, 435, 640 A.2d 34, 36 (1994). We have further explained that "a reasonable probability is a reasonable chance and not merely an abstract possibility." In re Burke, 2019 VT 28, ¶ 18 (quotation omitted). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," "a court need not determine whether counsel's performance was deficient." Strickland v. Washington, 466 U.S. 668, 697 (1984). Both prongs of ineffective assistance of counsel claims are "mixed question[s] of law and fact." In re Sharrow, 2017 VT 69, ¶ 11, 205 Vt. 309, 175 A.3d 1236.

¶ 33. Here, petitioner argues that he was prejudiced by the "cumulative effect" of trial counsel's (1) failure to accurately convey a plea offer, (2) errors during jury draw and opening statements, (3) failure to cross-examine the State's case key witnesses—namely, O'Brien, Leo, and Detective Higbee—and (4) failure to present a theory of the defense. We conclude that trial counsel's failure to convey the plea offer is outside the scope of this appeal because it was not part of this Court's 2007 remand order. We also conclude that petitioner has presented no expert

opinion that trial counsel's cross-examination of Detective Higbee was ineffective and no expert opinion that trial counsel's cross-examination of Leo was ineffective for the reasons he argues on appeal. On the remaining ineffective-assistance-of-counsel claims, we hold that petitioner has failed to demonstrate prejudice.[3]

## A. Plea Deal

¶ 34. The PCR court concluded that petitioner's trial counsel "fell short of minimal expectations for competent defense counsel" because he failed to accurately relate the State's plea offer.[4] However, the court concluded that this failure was "inconsequential" because "[a]s a matter of fact" petitioner would not have accepted the plea deal. On appeal, petitioner argues that the PCR court erred in this finding. We do not address this plea offer claim, however, because, based on the law-of-the-case doctrine, it is outside the scope of this Court's 2007 remand order.

¶ 35. The law-of-the-case doctrine provides that a "decision in a case . . . of last resort is the law of that case . . . throughout all the subsequent proceedings therein, and no question then necessarily involved and decided will be reconsidered by the Court." Coty v. Ramsey Assocs., Inc., 154 Vt. 168, 171, 573 A.2d 694, 696 (1990) (alterations in original) (quotation omitted).

---

[3] Petitioner, acting pro se, argues that the Court should remand the case to the trial court so he can "address his original claims of police and prosecutorial misconduct." We decline to do so. As the PCR court succinctly explained, "claims involving alleged prosecutorial and or law enforcement misconduct, including allegations over the complete and/or tardy failure to disclose various discovery and investigatory materials pretrial, are not within the mandate of the Supreme Court's remand in this PCR action. Those issues and claims have been already resolved adversely to [petitioner], either on direct appeal, or in the affirmance of the prior summary judgment order."

[4] On February 21, 1994, trial counsel advised petitioner that the State would accept a guilty plea to charges of second-degree murder and burglary with a recommendation to the court for a sentence of thirty years to life. Judge Pearson concluded that trial counsel failed to accurately convey this plea offer because trial counsel did not specifically explain to petitioner that he "would be free to argue for less" under the terms of the plea agreement. On appeal, however, petitioner argues that, based on trial counsel's representation, he "believed the State's offer was a recommendation of thirty-years-to-life for second-degree murder with a consecutive sentence for burglary." (Emphasis omitted.). Under petitioner's understanding, he could have received a maximum sentence of fifty-five years if he accepted the plea offer, which is twenty years more than the presumptive sentence for first-degree murder.

15

Accordingly, absent "exceptional circumstances," State v. Gomes, 166 Vt. 589, 591, 690 A.2d 351, 353 (1996) (mem.) (quotation omitted), when this Court remands a case, "our decision is the law of the case on the points presented throughout all the subsequent proceedings." State v. Higgins, 156 Vt. 192, 193, 588 A.2d 1062, 1062 (1991) (quotation omitted). Therefore, "on remand the trial court is constrained to follow our specific directions as interpreted in light of the opinion." Gomes, 166 Vt. at 590, 690 A.2d at 353 (quotation omitted).

¶ 36. In 1996, after this Court affirmed his conviction for first-degree murder, petitioner filed his first PCR petition, which raised at least thirty separate claims, including claims that trial counsel's assistance was ineffective because he failed to prepare a defense, conduct a pretrial investigation, interview witnesses, or accurately convey the State's plea offer. In April 2005, the PCR court granted summary judgment to the State on all the claims raised in petitioner's PCR petition. On appeal, petitioner did not generally challenge the PCR court's "disposition of any specific claim"; rather, he argued the PCR court erred in granting the State's motion for summary judgment because the State failed to provide evidentiary support. In re FitzGerald, 2007 VT 51, ¶ 6. Rejecting this argument, we explained that the "State's motion was supported by documentary evidence." Id. However, we noted that petitioner specifically asserted that the "State's motion was insufficient to refute his claims that trial counsel failed to conduct a pretrial investigation, prepare a defense, or interview witnesses." Id. ¶ 11. We agreed, reversing and remanding only the portion of the judgment dismissing these three claims. Id. ¶¶ 11, 18.

¶ 37. The law-of-the-case doctrine dictates that the PCR court was "constrained" toconsider only these three remanded issues. See Gomes, 166 Vt. at 590, 690 A.2d at 353 (quotation omitted). On remand, however, the PCR court addressed the plea offer issue, reasoning that it "[a]rguably [fell] within the broad umbrella of the claim for 'failure to prepare a defense.' " At oral argument, petitioner's counsel also argued that the plea offer is included within trial counsel's failure to prepare a defense. She explained: "When someone is facing life without parole

16

and the government, and the trial court, have found that the evidence is so overwhelming, there's one job left in order to defend against being sentenced to the worst possible sentence and that is to convey a plea deal properly, advise the client as to the pros and cons, and let them make an informed decision."

¶ 38.   While it is undoubtedly true that attorneys should accurately convey plea offers, the plea offer in this case was outside the scope of this Court's 2007 remand order.   The record indicates that trial counsel's failure to accurately convey the plea offer and trial counsel's failure to prepare a defense were independent ineffective-assistance-of-counsel claims.   Of the eighteen claims presented in petitioner's PCR petition, he specifically, and separately, alleged that trial counsel failed to "present a defense" and failed to accurately convey "the true terms of a plea offered by the State."   The PCR court evaluated them as separate claims, dismissing the failure to prepare a defense claim for lack of evidentiary support and addressing the failure to accurately convey the plea offer on the merits, concluding that it could not find that trial counsel's "advice . . . regarding th[e] plea offer was . . . unreasonable."   It is accordingly clear that when this Court considered the PCR court's decision and remanded the failure-to-prepare-a-defense claim, the Court did not consider whether trial counsel accurately conveyed the plea offer to be subsumed within the failure-to-prepare-a-defense claim.

¶ 39.   To the extent petitioner nevertheless argues on appeal that somehow the plea offer issue is a subset of his claim that trial counsel failed to prepare a defense, we are unpersuaded: Consideration of a plea offer is not preparation of a defense.[5]

---

[5]   In his pro se reply brief, petitioner argues that "the interests of justice" and judicial economy would be served by addressing the plea offer because if the Court does not address it, he could pursue a federal habeas claim.   Whatever the merits of petitioner's habeas claim, the plea offer issue was not part of this Court's 2007 remand order and is therefore not within the scope of this appeal.

## B. Cross-Examination of Detective Higbee and Leo

¶ 40. Considering the testimony of Allen, Judge Pearson concluded that trial counsel's "performance in the area of cross-examination of several key witnesses was deficient." With regard to Leo specifically, Allen testified that trial counsel's assistance was ineffective because he failed to establish that Leo had a financial incentive to testify during jury draw and opening statements. Nevertheless, Judge Pearson concluded that petitioner could not establish he was prejudiced by this error because he did not provide any "specific description of more vigorous cross-examination that could have been accomplished." Judge Pearson did not specifically address if trial counsel's assistance was ineffective in his cross-examination of Detective Higbee because Allen did not offer any opinion on whether trial counsel's "performance was deficient in this particular regard."

¶ 41. On appeal, petitioner argues the PCR court erred because he did show how trial counsel's failure to cross-examine Leo prejudiced the outcome of the trial. Specifically, petitioner argues that trial counsel could have impeached Leo about police notes indicating that he reported petitioner's admission to police in October 1993, not in March as he testified. Furthermore, even though Judge Pearson did not determine that trial counsel's cross-examination of Detective Higbee was ineffective, petitioner suggests that he was prejudiced because trial counsel could have impeached Detective Higbee on his testimony that petitioner <u>volunteered</u> information about the condition of Amy's bathroom. Citing to police notes, petitioner argues that, contrary to his testimony, Detective Higbee <u>asked</u> petitioner to describe the condition of the bathroom. We conclude that petitioner failed to present the necessary expert testimony to support these claims.

¶ 42. Because "[t]rial counsel are permitted a great deal of discretion in decisions regarding trial strategy," <u>In re Dunbar</u>, 162 Vt. at 212, 647 A.2d at 319, "expert testimony is generally required to show that an attorney's conduct fell below the standard of accepted practice in Vermont," <u>In re Burke</u>, 2019 VT 28, ¶ 19. "Where a professional's lack of care is so apparent

18

that only common knowledge and experience are needed to comprehend it, expert testimony is not required." In re Grega, 2003 VT 77, ¶ 16 (quotation omitted) (noting that "sleeping counsel is considered equivalent to no counsel at all").

¶ 43. First, as Judge Pearson noted, petitioner presented no expert testimony that trial counsel's assistance was ineffective in his cross-examination of Detective Higbee. Petitioner's expert testified only that counsel was "subpar" during his cross-examination of Amy's two neighbors, O'Brien, and petitioner's siblings. Without any expert testimony whatsoever, petitioner cannot show that trial counsel's assistance was ineffective because of his cross-examination of Detective Higbee.

¶ 44. Second, although Allen presented testimony about why trial counsel's assistance was ineffective in regard to his cross-examination of Leo, he presented no testimony on the grounds that petitioner has pursued on appeal. Specifically, Allen explained that although counsel had "some luck" in establishing that Leo had a financial incentive to testify, "[h]e could have mentioned it in the opening statement" and during jury draw. On appeal, however, petitioner argues that trial counsel's assistance was ineffective because trial counsel failed to cross-examine Leo based upon police notes that suggest he reported petitioner's confession to the police in October 1993. Without expert testimony on this issue, petitioner cannot demonstrate that trial counsel's assistance was ineffective for failing to cross-examine Leo based on when he told police about petitioner's admission of having been at the scene.

C. Remaining Claims

¶ 45. Petitioner's remaining ineffective assistance claims are that trial counsel (1) made prejudicial errors during opening statements and jury draw; (2) failed to adequately cross-examine O'Brien; and (3) failed to present a theory of the defense. We outline each claim in further detail

below and conclude that given the overwhelming evidence of guilt, petitioner cannot establish he was prejudiced by these errors.[6]

### 1. Opening Statements/Jury Draw

¶ 46.    The PCR court concluded that trial counsel's errors during opening statements and jury draw were "too speculative, and too subjective . . . to conclude [that] the 'reasonable probability' of prejudice has been established."  On appeal, petitioner argues that the PCR court erred because the "negative characterization of [petitioner] and [trial counsel's] decision to lay the blame for choosing not to testify at [petitioner]'s feet combine to create a reasonable probability that these errors . . . prejudiced the outcome."

### 2. Failure to Cross-Examine O'Brien

¶ 47.    The PCR court concluded that petitioner failed to show prejudice, explaining that "there is simply no showing on this record of any specific evidence or testimony, on cross-examination or otherwise, that would, or could, or should have been adduced at trial if only [trial counsel's] performance had met minimal expectations."  On appeal, petitioner argues that trial counsel "could have highlighted several possible ways that O'Brien might have learned" the details of the crime scene.  For example, trial counsel could have, according to petitioner, suggested that the source of O'Brien's knowledge of the crime scene came from the police because by the time of her trial testimony the police had thoroughly interviewed her.

### 3. Theory of the Case

¶ 48.    Finally, although the PCR court determined that trial counsel's assistance was ineffective because he failed to "develop and present to the jury . . . [a] defense which would have

---

[6]    In his supplemental reply brief, petitioner emphasizes that we should consider the cumulative effect of trial counsel's ineffective assistance, including trial counsel's failure to challenge the FBI's false hair evidence.  Although petitioner is correct that trial counsel's errors must be viewed cumulatively, we cannot consider the false-evidence claim with the other ineffective-assistance-of-counsel claims because the false-evidence claim was not before Judge Pearson and arises out of a separate decision with a different record and legal standard on appeal.

been consistent with arguable innocence," the court concluded that petitioner failed to show he was prejudiced by this error. On appeal, petitioner argues that he was prejudiced because trial counsel had a potential theory of defense: "[Petitioner] was in Texas when his wife was killed and that Ricky Rodriguez and Denise O'Brien killed her." To support this theory, petitioner argues that a call came from the victim's home phone a day after the State claims the victim died, and at that point, petitioner was back in Texas. Petitioner also points to two pieces of evidence that would suggest O'Brien's and Rodriguez's culpability: (1) a State's witness who identified two people—a man and possibly a woman—abandoning Amy's car the morning of the murder (2) and police field notes indicating that the man in Amy's car that morning was Rodriguez.

### 4. Analysis

¶ 49. We assume, without deciding, that the PCR court was correct in determining that trial counsel fell below minimum standards of competence in failing to: (1) humanize petitioner during opening statements; (2) effectively cross-examine O'Brien; and (3) to present a coherent theory of defense. The remaining question is whether the PCR court correctly determined that petitioner failed to demonstrate prejudice.

¶ 50. In determining whether petitioner was prejudiced, we "must take into account all of the evidence before the jury." In re Towne, 2013 VT 90, ¶ 9, 195 Vt. 42, 86 A.3d 429 (citing Strickland, 466 U.S. at 695). Accordingly, "[t]he relative strength of a particular case has clear import in analyzing the reasonable probability of a different outcome." Id. ¶ 18. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." In re Sharrow, 2017 VT 69, ¶ 11 (quotation omitted); compare In re Towne, 2013 VT 90, ¶ 13 ("Based on the totality of evidence at petitioner's murder trial, no possible result of [additional evidence] would sufficiently undermine our confidence in the verdict . . . ."), with In re Russo, 2010 VT 16, ¶ 18, 187 Vt. 367, 991 A.2d 1073 (affirming grant of PCR petition because of "insubstantial nature of the evidence that the State put forth at

21

trial"). Accordingly, "[t]aking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the [petitioner] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." In re Sharrow, 2017 VT 69, ¶ 11 (quotation omitted).

¶ 51. Applying the above principles, petitioner's claims of prejudice must be evaluated in light of the fact that over the course of a fourteen-day trial with over thirty five witnesses, the State presented "strongly probative and abundant" evidence of petitioner's guilt. FitzGerald, 165 Vt. at 351, 683 A.2d at 16. Given this overwhelming evidence, petitioner has failed to establish he was prejudiced by trial counsel's cumulative errors.

¶ 52. First, it may be industry practice, as Allen testified, to suggest to the jury that the attorney decides if the client will testify at trial.[7] We fail to see, however, how trial counsel's truthful statement to the jury that it was petitioner's decision as to whether he should testify, see State v. Tribble, 2012 VT 105, ¶ 54, 193 Vt. 194, 67 A.3d 210 (recognizing "that the accused has the ultimate authority to make certain fundamental decisions," which includes the right to "testify in his or her own behalf" (quotation omitted)), could have prejudiced petitioner. This is especially true given that during jury draw, trial counsel expressly asked potential jurors if they would hold it against petitioner if he decided not to testify. Trial counsel returned to this point during closing arguments:

> My client didn't take the stand. We talked about that. That is not to be used against him. He does not have to prove anything, and you all indicated to me that you would not use that against him. . . . There's many reasons why you could speculate he hasn't in this

---

[7] Although we do not address the PCR court's conclusions on whether trial counsel's assistance was ineffective, we note that we are troubled by Allen's suggestion that it is industry practice to suggest to the jury that the attorney decides whether the client will testify at trial. Attorneys have a duty of candor to the tribunal and "shall not knowingly: (1) make a false statement of fact or law to a tribunal." V.R.P.C. 3.3(a)(1). Inaccurately suggesting to the jury that it is the attorney's decision as to whether the client will testify runs counter to this ethical obligation. See V.R.P.C. 1.2(a) (providing that attorneys "shall abide by the client's decision, after consultation with the lawyer, as to . . . whether the client will testify").

case; some may be consistent with guilt, some may be consistent with innocence, but that's not to be used in any way against him.

¶ 53. Relatedly, we fail to see how petitioner was prejudiced by trial counsel's concession of petitioner's adverse qualities during jury draw. Judge Pearson concluded that trial counsel's errors during jury draw and opening statements "were too small in the larger scheme of things to likely have had any material effect." On appeal, petitioner simply reasserts that he was prejudiced without providing any additional explanation as to why Judge Pearson erred in this conclusion. These assertions are insufficient to establish prejudice.

¶ 54. Second, we reach the same conclusion with respect to trial counsel's cross-examination of O'Brien. Petitioner argues that trial counsel "could have suggested that the source of . . . O'Brien's information was the police or a defense investigator." It is true that counsel "could have suggested" O'Brien's information about the crime scene came from the police, but this is mere speculation. Petitioner's expert witness admitted as much on cross-examination:

> Q. Okay. And you talked about, you know, he needed to show some motive for her to lie. You agree he did make an effort to show the motive for her to lie, correct?
>
> A. Some.
>
> . . . .
>
> Q. Okay. And you said he didn't try to explain how she knew about the kitty litter, but you don't know that she had any other way of knowing about it other than [petitioner] having . . . told her, right?
>
> A. Well, I think he needed to establish various ways that she could have known about it even if he didn't get her to say that this is how she knew about it; so you discussed this case with Ms. Crampton, the investigator from the public defender's office, and did she tell you about what happened up in Vermont, you know, and [did] she tell you about the crime scene, and if you went about it the right way, I think you'd get some yeses through that.
>
> Q. But you don't know that?
>
> A . Yeah, you don't know that because he didn't do it . . . .

23

In short, petitioner's claim that he was prejudiced by trial counsel's cross-examination of O'Brien is mere speculation. And "mere speculation is not sufficient" to establish prejudice. Byrd v. Workman, 645 F.3d 1159, 1168-69 (10th Cir. 2011).

¶ 55. Furthermore, ample evidence in the record supports O'Brien's testimony. Leo testified that petitioner admitted that he saw Amy dead in her apartment. Petitioner's cousin also testified that petitioner told him that Amy was killed in the bedroom and then dragged into the bathroom. In addition, the State produced significant evidence illustrating that petitioner engaged in an elaborate scheme of travel whereby he flew to Connecticut and had Rodriguez pick him up from the airport, which is exactly how O'Brien testified that petitioner planned to commit the murder. This other evidence further undermines petitioner's speculation that had trial counsel cross-examined O'Brien about the source of her information, it would have had a reasonable probability of affecting the outcome.

¶ 56. Finally, with regard to trial counsel's alleged failure to prepare a defense, Allen conceded that "there's a lot to be explained away." On cross-examination, when asked directly about what trial counsel's theory of the defense should have been, Allen responded: "I can't give you the explanation that I would have offered if I had been . . . at that trial."

¶ 57. Petitioner nevertheless argues that there was a potential theory of the defense—that petitioner was in Texas when his wife was killed by Rodriguez and O'Brien. Petitioner argues that his theory of the defense is supported by the record because: (1) a phone call came from the victim's home phone a day after the State claims the victim died; (2) a State's witness, Armand Blow, testified at trial that he identified two people—a man and possibly a woman—abandoning Amy's car the morning of the murder; and (3) police field notes indicate that the man in Amy's car that morning was Rodriguez.

¶ 58. As an initial matter, accepting all petitioner's unsupported allegations as true, his theory of the defense fails to withstand basic scrutiny. He argues that the alleged phone call from

24

Amy's house on May 9 undermines the State's theory because it shows Amy was still alive on May 9 and petitioner was in Texas at that point. However, petitioner also argues that Armand Blow and the police notes show that Rodriguez and O'Brien committed the murder. But Blow testified to seeing a man and possibly a woman abandon Amy's car on the morning of May 8, which supports the State's theory that Amy was killed on the early morning hours of May 8. To summarize, this is petitioner's inconsistent theory of the defense: He could not have killed Amy because the phone call indicates she was alive on May 9, at which point he was back in Texas. Instead, Rodriguez and O'Brien killed Amy because Blow's testimony and the police notes indicate that they murdered her on May 8 and then abandoned her car that morning.

¶ 59.    Notwithstanding the above conclusion, petitioner's allegations are not supported by the record and simply ignore the PCR court's factual findings. The PCR court found that the phone record was "at best smudgy and unclear" and there was nothing in the field notes "to have actually offered even marginal assistance in helping to create reasonable doubt." (Emphasis omitted.) Other than asserting that the PCR court's finding about the police notes was "unfounded," petitioner has not argued—nor demonstrated—that these findings were clearly erroneous.

¶ 60.    In addition, petitioner overstates the significance of Blow's testimony. On direct examination, Blow testified that on his way to work on the morning of May 8, he noticed a person exit a parked vehicle, which belonged to Amy, and get into a second vehicle. Blow testified that he "thought" the person driving the second vehicle was a male. On cross-examination, the following exchange occurred:

> [Trial Counsel:]  Could it have been a female driver in the second car?
>
> [Blow:]  It was possible.
>
> [Trial Counsel:]  Didn't see that person at all really?
>
> [Blow:]  In the second car I saw like a silhouette of the head and shoulders. That's all I could see.

When placed in context, Blow's testimony indicates that he saw a "silhouette" and speculated that it was "possible" the silhouette could have been a woman. This speculative admission on cross-examination provides, at best, minimal support for petitioner's allegation that Rodriguez and O'Brien murdered Amy, especially when Blow admitted that he saw only a silhouette. But more importantly, one witness—testifying on the first day of a fourteen-day trial—who possibly identified a woman abandoning Amy's car does not come close to establishing that petitioner was prejudiced by trial counsel's alleged failure to prepare a defense given the other significant evidence of petitioner's guilt.

¶ 61. All in all, after carefully considering the record and the arguments presented, petitioner has failed to show that he was prejudiced by trial counsel's alleged (1) errors during opening statements and jury draw; (2) failure to adequately cross-examine O'Brien; and (3) failure to present a theory of the defense. Although petitioner repeatedly argues that he was prejudiced by these cumulative errors, he relies on evidence that the PCR court found had minimal value, repeatedly speculates about what trial counsel should have done, and ignores several actions trial counsel took that minimized the effect of his alleged errors.

¶ 62. In so holding, we reiterate—and emphasize—the significant evidence of petitioner's guilt. The record indicates that petitioner had motive to murder Amy—he lied for over a year about attending school, falsely reported her jeep stolen, and had an affair with another woman. The record also shows that petitioner engaged in an elaborate scheme attempting to conceal his involvement in the crime. Multiple other witnesses besides O'Brien—including petitioner's brother and cousin—implicated petitioner in the crime. Furthermore, multiple witnesses observed that petitioner had several scratches on his arms and face in the days following Amy's murder. The record also demonstrates that petitioner repeatedly lied to the police about not being able to find a flight out of Texas on May 11. Finally, petitioner made inconsistent

26

statements to Detective Higbee about his whereabouts on May 7. First, he told Detective Higbee that he was in Texas at a bar where no one would recognize him and then falsely told Detective Higbee that he went to bail Rodriguez out of jail. Given this "strongly probative and abundant evidence," FitzGerald, 165 Vt. at 351, 683 A.2d at 16, petitioner has failed to demonstrate he was prejudiced by trial counsel's alleged cumulative errors during his 1994 criminal trial.

IV. Judge Toor's April 2019 Summary-Judgment Ruling

¶ 63. Petitioner argues that Judge Toor erred in granting summary judgment to the State on his false-evidence and ineffective-assistance-of-counsel claims. "Generally, when reviewing a grant of summary judgment in a PCR proceeding, this Court applies the same standard as the trial court, viewing the facts in the light most favorable to the nonmoving party." In re Dow, 2019 VT 72, ¶ 6, ___ Vt. ___, 220 A.3d 1261 (quotation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). We conclude that Judge Toor correctly granted summary judgment to the State because petitioner failed to establish that the State knowingly presented false evidence and that, assuming trial counsel's assistance was ineffective for failing to challenge Agent Oakes' testimony, petitioner failed to demonstrate prejudice.

A. False Evidence

¶ 64. The PCR court concluded that petitioner could not show "that the FBI agent and the prosecutor knew" the hair testimony was false in 1994. On appeal, petitioner argues that the PCR court should not have considered the State's knowledge about the false hair evidence because the State did not raise the issue below. On the merits, petitioner argues that because in the Brady context, the knowledge of anyone working on behalf of the government is imputed to the prosecution, he is required to demonstrate only Agent Oakes' knowledge. And petitioner posits that Agent Oakes "at the very least should have known about the weaknesses of microscopic hair analysis that others in the field had already acknowledged at the time of [petitioner]'s trial."

27

¶ 65. Due process "guarantee[s] the right of a defendant to discover relevant evidence, whether favorable or harmful." State v. Dunbar, 152 Vt. 399, 408, 566 A.2d 970, 975 (1989). Accordingly, in Brady v. Maryland, 373 U.S. 83 (1963), "the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment." State v. Gibbons, 146 Vt. 342, 344, 503 A.2d 540, 541 (1985) (quotation omitted). The principle announced in Brady also applies where the "undisclosed evidence demonstrates that the prosecution's case includes perjured testimony." United States v. Agurs, 427 U.S. 97, 103 (1976); accord State v. Goshea, 137 Vt. 69, 74, 398 A.2d 289, 293 (1979).

¶ 66. It is accordingly well established that "[a] conviction obtained through the use of false evidence, which the State knows to be false and which the State either solicits or allows to go uncorrected, is a violation of due process." State v. Davis, 2010 VT 9, ¶ 13, 187 Vt. 594, 999 A.2d 302 (mem.). "To succeed on such a claim, [petitioner] must establish not only the knowing use of false evidence, but that he suffered prejudice as a result." Id. (emphasis added). Prejudice occurred if there is any "reasonable probability" that the false evidence could have affected the judgment of the jury. See State v. Zele, 168 Vt. 154, 162, 716 A.2d 833, 839 (1998); State v. Rehkop, 2006 VT 72, ¶ 31, 180 Vt. 228, 908 A.2d 488.

¶ 67. As a threshold matter, petitioner argues that the State did not contest below that it knew Agent Oakes' testimony was false and that its "newly-raised arguments on this issue should be given little, if any, weight on appeal." Despite petitioner's claims to the contrary, the State did raise arguments below about the knowledge issue. The State argued below that "in 1994, a reasonable attorney could not be expected to have known that in 2009 the National Academy of Sciences would issue a report calling into question the FBI's use of hair comparison evidence." The PCR court then similarly ruled that the State could not have known the hair evidence was false in 1994 because "[i]t was not until 2009 that the National Academy of Sciences issued a seminal

28

report on the issue." In fact, petitioner argues elsewhere in his brief that the PCR court "relied upon" the State's argument "in rendering its decision."

¶ 68. Turning to the merits, the letters petitioner received from the DOJ indicate that Agent Oakes' testimony was misleading. They explicitly state that the "microscopic hair comparison analysis testimony . . . presented in [petitioner's] case included statements that exceeded the limits of science." Although the State argued below that Agent Oakes testimony "scarcely exceeded" the limits of hair microscopy science, its focus on appeal is whether the State knew the testimony was false in 1994. The only issue on appeal is therefore the State's knowledge about the hair testimony in 1994.

¶ 69. Petitioner, citing Agurs, 427 U.S. at 103, argues that the standard for false-evidence claims is whether the State "knew or should have known" about the false evidence. It is true that in Agurs, the United States Supreme Court acknowledged that it had previously held the standard for false-evidence claims was whether the "prosecution knew, or should have known," of the false evidence. Id.; see also State v. Goshea, 137 Vt. at 74, 398 A.2d at 293 (citing Agurs for proposition that standard for false-evidence claims is whether "prosecution knew, or should have known, that its case included perjured testimony"). In the next sentence, however, the Supreme Court clarified that the standard for false-evidence claims is whether the State knowingly presented false evidence. Agurs, 427 U.S. at 103. Our precedent leads to the same result: We have repeatedly held that the standard for false evidence is whether the State knowingly used false evidence. State v. Briggs, 152 Vt. 531, 538, 568 A.2d 779, 783 (1989); State v. Ladabouche, 146 Vt. 279, 281, 502 A.2d 852, 854 (1985); see also State v. Davis, 2010 VT 9, ¶ 15, 187 Vt. 394, 992 A.2d 302 (rejecting defendant's argument that State presented false evidence because it " 'had every reason to believe' that the witness would testify" falsely).

¶ 70. Notwithstanding this knowledge standard, petitioner neither argues nor presents any evidence that the prosecutor at his criminal trial knew the hair evidence was false. Instead, he

argues that he is required to show only that Agent Oakes knew his testimony was false. In the context of <u>Brady</u> violations for failing to disclose evidence, the United States Supreme Court has held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf." <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995). Accordingly, in determining whether prosecutors have a duty to disclose evidence, they are "charged with knowledge" of anyone acting on their behalf. <u>Strickler v. Greene</u>, 527 U.S. 263, 275 n.12 (1999). Here, because the State called Agent Oakes as an expert witness at trial, petitioner argues that Agent Oakes was "acting on the government's behalf," <u>Whitley</u>, 514 U.S. at 437, and the State is therefore charged with Agent Oakes' knowledge.

¶ 71. Assuming, without deciding, that the State can be charged with a witness's knowledge that his or her testimony was false, petitioner does not present any evidence that Agent Oakes knew his testimony was false. For example, petitioner suggests, rather questionably, that the FBI knew hair microscopy evidence was false in 1994 because of a statement by Dr. Peter Forest, a professor of criminalistics, at a 1985 FBI symposium on Forensic Hair Comparison suggesting that hair microscopic analysis is "misleading" and "not substantiated by any data." Whatever this evidence demonstrates about the FBI's knowledge in 1994, it in no way demonstrates that Agent Oakes knew his hair evidence testimony was false in 1994. Petitioner implicitly concedes this point by arguing that Agent Oakes "should have known" that his hair testimony was false.

¶ 72. Petitioner also argues that it is "highly relevant" that the DOJ has conceded "that knowledge of the flaws in hair microscopy should be imputed to the prosecution." Given that this case does not involve a federal prosecution, this concession has no legal significance: The State has not made the same concession, and the DOJ has no authority to concede that the State knowingly used false evidence.

¶ 73.    In sum, assuming the State can be charged with Agent Oakes' knowledge, petitioner presents no evidence that Agent Oakes knew his testimony was false in 1994. Accordingly, the PCR court did not err in granting summary judgment to the State on the false-evidence claim.

### B.  Failure to Challenge the Hair Evidence

¶ 74.    The PCR court did not address whether trial counsel's assistance was ineffective for failing to challenge the hair evidence because it concluded that, assuming trial counsel's assistance was ineffective, petitioner could not establish prejudice.  The court, citing eleven pieces of evidence, concluded that "[t]his was one of the strongest cases for the prosecution that the undersigned has ever seen in almost twenty years on the bench."  On appeal, petitioner maintains that he was prejudiced by trial counsel's failure to challenge the hair evidence because "[b]y not contesting the faulty science underlying Oakes' testimony, defense counsel conceded that [petitioner's] hair was found in the same room as Amy FitzGerald's body," which "prohibited [petitioner] from presenting any plausible defense."

¶ 75.    To prevail on an ineffective-assistance-of-counsel claim, a petitioner must show that counsel's performance fell below an objective standard of reasonableness and he or she suffered prejudice.  See In re Combs, 2011 VT 75, ¶ 9.  Here, because the PCR court did not decide whether trial counsel's performance was deficient, we address only whether the court correctly determined that petitioner failed to demonstrate prejudice.  As described in detail above, supra, ¶ 50, in determining whether petitioner was prejudiced, we "must take into account all of the evidence before the jury."  In re Towne, 2013 VT 90, ¶ 9.

¶ 76.    Petitioner is incorrect that Agent Oakes' testimony was prejudicial because it prevented him from presenting a defense: Petitioner's own statements to Detective Higbee provided an innocent explanation for the hair found in Amy's bathroom and trial counsel expressly raised this explanation during closing arguments.  Petitioner acknowledged that he had recently

31

been in Amy's bathroom. He told Detective Higbee that "during his last visit" to Amy's apartment, which was about four weeks earlier, he took a bubble bath and "he had to pick out hair . . . from the bathtub . . . or from the bathroom in order to do that." During closing arguments, trial counsel expressly argued that there was nothing probative about Agent Oakes's testimony. He explained that the hair was unimportant:

> [T]his is an apartment that he had been into several weeks before. This is where his wife lived, and to suggest that there's something incriminating to the level of evidence in a first degree murder case that a hair of his was found in the apartment . . . .

It is accordingly factually incorrect to assert that the hair evidence prejudiced petitioner by preventing him from presenting a defense.

¶ 77. Furthermore, whatever prejudicial effect Agent Oakes' testimony had is outweighed by the totality of the evidence before the jury. Id. Judge Toor, "accepting all of [petitioner's] proffered facts . . . as true," summarized the evidence produced at his 1994 criminal trial:

> (1) [Petitioner] had misled his wife Amy FitzGerald into believing he was attending college in Texas although he was not; (2) he reported his wife's Jeep to be stolen but had instead stored it in a storage locker; (3) he was involved with another woman, (4) he had a $100,000 life insurance policy on his wife; (5) less than two months before the murder he told a friend he would pay her to drive him to his wife's home in Vermont, where he planned to hit Amy on the head with a baseball bat and then make it look as if she had slipped in the bath; (6) he arrived in Vermont by car on May 7, 1994 and Amy was murdered on May 8; (7) he told his friend on May 11 that Amy was dead and that everything went okay but it wasn't as easy as he thought it would be because she fought him all the way; (8) on May 19 he told his cousin that he had killed Amy, and tried to pay the cousin $15,000 to try to point the finger away from [petitioner] as a suspect; (9) [petitioner] lied about not being able to get a flight to Vermont when alerted of the death by the police; (10) he had scratches on his face, forearm, finger and palm when he met with police on May 13; and (11) he lied about his whereabouts on May 7 and 8, saying he had bailed out a friend in New Orleans who was actually bailed out on May 3.

Considering all of this evidence, petitioner has failed to demonstrate that he was prejudiced by trial counsel's alleged failure to challenge Agent Oakes's false testimony.

Affirmed.

FOR THE COURT:

_____

Associate Justice